

DISTRICT OF COLUMBIA, ss:

<u>DECLARATION OF TOM HEINEMANN</u>

I, Tom Heinemann, declare and say as follows:

1.  I am an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C.  This office has responsibility for extradition requests, and I am charged with the extradition case of Cesar Horacio Duarte Jaquez.  I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2.  The relevant and applicable treaty provisions in full force and effect between the United States and Mexico are found in the Extradition Treaty between the United States of America and the United Mexican States of May 4, 1978 (TIAS 9656), hereafter the "Treaty."  A copy of the Treaty is attached to this declaration.

3.  In accordance with the provisions of the Treaty, the Embassy of Mexico has submitted Diplomatic Note No. 06219R, dated December 27, 2019, formally requesting the extradition of Cesar Horacio Duarte Jaquez.  A copy of the diplomatic note is attached to this declaration.

4.  In accordance with Article 13(3) of the Treaty, the Government of the United States of America represents the interests of the Government of Mexico in proceedings in U.S. courts arising out of Mexico's extradition requests, and the Government of Mexico provides similar representation in its courts with respect to extradition requests made by the United States.

5.  The offenses for which extradition is sought are covered under Article 2 of Treaty.

2002556421

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...tify That Tom Heinemann, whose name is subscribed to the document hereunto annexed, was
...e of subscribing the same Assistant Legal Adviser, Office of the Legal Adviser, Department
...United States of America, and that full faith and credit are due to his acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*



In testimony whereof, I, Michael R. Pompeo, Secretary of State ,
have hereunto caused the seal of the Department of State to be
affixed and my name subscribed by the Assistant Authentication
Officer, of the said Department, at the city of Washington, in the
District of Columbia, this tenth day of March, 2020.

*Michael R. Pompeo*

Secretary of State

By *T. Crawford*

Assistant Authentication Officer,
Department of State

*Issued pu... to CH... ate of
Sept. 15, ... 1 Stat ...0; 22
USC 265 ...SC 265 ... USC
301; 28 U... 733 et. s... USC
1443(f); F...14 Feder... es of
Civil Proc...*

6. The documents submitted by the Government of Mexico in support of its extradition request were certified on December 17, 2019, by Donald Heflin, Minister Counselor for Consular and Consulate Affairs, in accordance with Title 18, United States Code, Section 3190. Mr. Heflin, at the time he certified the documents, was the principal consular officer of the United States in Mexico.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 9th, 2020.

Tom Heinemann

Attachments:
1.   Copy of Diplomatic Note
2.   Copy of Treaty

**UNOFFICIAL TRANSLATION**

**06219R**

Washington, D.C., December 27, 2019

Mr. Secretary:

On behalf of my Government, I have the honor to refer to the Extradition Treaty signed between the United Mexican States and the United States of America, in order to request from your Government, on the basis of Article 2, and particularly Article 10 of the Extradition Treaty, the **FORMAL REQUEST FOR INTERNATIONAL EXTRADITION** of **CÉSAR HORACIO DUARTE JÁQUEZ**, who is wanted by Mexican authorities for his alleged perpetration of the crimes of **EMBEZZLEMENT OF PUBLIC FUNDS (*PECULADO*)** and **CRIMINAL ASSOCIATION (*ASOCIACION DELICTUOSA*).**

It is known that **CÉSAR HORACIO DUARTE JÁQUEZ** is located in the United States.

(ARREST WARRANT...)

To the Honorable
Michael Richard Pompeo
Secretary of State
Washington, D.C.

## ARREST WARRANT

On October 8, 2019, the Control Judge for Pre-Trial Proceedings in the Judicial District of Morelos, State of Chihuahua, issued an arrest warrant against **CÉSAR HORACIO DUARTE JÁQUEZ** within the criminal case number 3041/2019, for his alleged perpetration of the crimes of **EMBEZZLEMENT OF PUBLIC FUNDS (PECULADO)** and **CRIMINAL ASSOCIATION (ASOCIACIÓN DELICTUOSA)**, both aggravated. The crime of embezzlement of public funds is defined and punished in Article 270, paragraph first, section I, and paragraph second of the Criminal Code for the State of Chihuahua. The crime of criminal association is defined and punished in Article 246, in relation to Article 248, both of the Criminal Code for the State of Chihuahua, which was the regulation in effect at the time when the events took place.

The conducts attributed to the accused, for which the arrest warrant was issued, are punishable pursuant to the laws of both countries with a prison sentence of no less than one year, as established by Article 2, numbers 1 and 4 section a) of the Extradition Treaty between the United Mexican States and the United States of America, as related in Clause 9 of its appendix.

## STATUTE OF LIMITATIONS

On October 8, 2019, the Control Judge for Pre-Trial Proceedings in the Judicial District of Morelos, State of Chihuahua, issued a resolution establishing that the facts for which the extradition of **CÉSAR HORACIO DUARTE JÁQUEZ** is requested are crimes whose statutes of limitations have not expired.

The judge said that, pursuant to the statutes of limitations in the laws for the State of Chihuahua, specifically Article 107 of the Criminal Code of the State of Chihuahua, it is established that the terms for the statutes of limitations will be doubled for those who are outside the state. Also, the judge stated that the doubling of the statutes of limitations in the laws of Chihuahua results from the international obligations contracted by the Mexican state before the United Nations System by adopting the United Nations Convention Against Corruption, which states on Article 29:

> *"Each State Party shall, where appropriate, establish under its domestic law a long statute of limitations period in which to commence proceedings for any offence established in accordance with this Convention and establish a longer statute of limitations period or provide for the suspension of the statute of limitations where the alleged offender has evaded the administration of justice..."*

In this regard, the Convention establishes that the states have the duty to classify, among others, the crime of embezzlement of public funds, when it is willfully committed by a public servant for his or her own benefit or for the benefit of third parties. The embezzlement of public funds may include the misappropriation of assets, funds or any other thing of value that has been received by the servant due to his or her position.

Based on the above, and considering what benefits the accused the most regarding the crime of embezzlement of public funds with aggravated penalty, the judge ruled that, given the fact that the first event took place on June 17, 2011 and the last on November 28, 2014, the statute of limitations will expire at the end of June 16, 2027 and the end of November 27, 2030 in favor of **CÉSAR HORACIO DUARTE JÁQUEZ**.

Also, regarding the crime of Criminal Association, given that the last event took place on November 28, 2014, the statute of limitations will expire at the end of August 27, 2024.

3

Lastly, the Control Judge for Pre-Trial Proceedings established that, given that it is known that **CÉSAR HORACIO DUARTE JÁQUEZ** has been issued a Red Notice by the INTERPOL, and given that he was summoned to appear before that court and he did not do so, there is no doubt that the accused has evaded the administration and delivery of justice. Given that the statutes of limitations have not expired, the arrest warrant is valid and enforceable.

The elements of proof that were analyzed by the Control Judge for Pre-Trial Proceedings in the Judicial District of Morelos, State of Chihuahua, which confirm the alleged perpetration of the crimes and led the court hearing the case to issue the arrest warrant against **CÉSAR HORACIO DUARTE JÁQUEZ**, are based on, among others, the following:

## FACTS

**CÉSAR HORACIO DUARTE JÁQUEZ** was the Constitutional Governor of the State of Chihuahua from October 4, 2010 to October 3, 2016. Said position put him in charge of the Executive Branch at a state level and, therefore, he had a wide set of powers and obligations, such as administering the assets owned by the state to meet the objectives for which they were intended. However, the accused took advantage of the situation and embezzled public resources for the amount of $96,685,253.80 Mexican pesos, which were extracted between 2011 and 2014 from several accounts belonging to the Internal Revenue Service for the Government of the State of Chihuahua (*Secretaría de Hacienda del Gobierno del Estado de Chihuahua*). For this purpose, he assigned several roles and activities, as established by different public servants and people outside public service.

The aforementioned embezzlement    was performed through 11 fraudulent administrative procedures where 17 payments were made to Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua (hereinafter Unión Ganadera) and to "Financiera de la División del Norte", S.A. de CV, SOFOM, ENR[1] (hereinafter Financiera). Also, while he was working as Governor, he was also a shareholder and president of the Board of Directors for Unión Ganadera, as established in the registration dated May 24, 2007 in the National Agricultural Registry, with resolution number 110.01.GC30/07 (also known as 110.04-GC30/07), page 8-1-3.

Also, **CÉSAR HORACIO DUARTE JÁQUEZ** worked as founder, main shareholder and president of the administration board of Financiera because he owned 98% of the "A" series shares that are part of its capital stock, which is about 5,900 of the total 6,000 shares. Also, he owned 93.35% of the "B" series shares, which consists of 28,940 of the total 31,000 shares. The previous information was obtained from the registration in the

---

[1] The acronym S.A. de C.V., SOFOM, ENR refer to a variable capital corporation, multiple-purpose financial institution, non-regulated entity and is defined in the Mexican business law as follows:

General Corporations Law

Article 87 - A corporation exists under a name and is exclusively comprised of shareholders whose obligations are limited to the payment of their shares.

Article 88 - The name will be formed freely, but it will be different from that of any other corporation and, when used, it must always be followed by the words "Sociedad Anónima" (Corporation) or its acronym, "S.A."

Article 213 - In variable capital corporations, capital stock may be increased through contributions made by the shareholders or by admitting new shareholders. It may also be decreased through the partial or total withdrawal of the contributions, and the only formalities required for this are those established in this chapter.

Article 215 - The corporate or registered name and the type of corporation will always be followed by the words "de Capital Variable" (variable capital) ... C.V.

General Law of Ancillary Credit Organizations and Activities

Article 87-B. ....
... Those corporations who have expressly included in their bylaws the common and professional performance of one or more of the activities mentioned in the previous paragraph, will be considered multiple-purpose financial institutions. Said corporations will include financial entities, which may be:
(...)
II.        Non-regulated multiple-purpose financial institutions.
The corporations established in section II of this article will be those that do not have any of the entities mentioned in the previous paragraph participating in their capital stock under the aforementioned terms and conditions. These corporations must add to their corporate name the expression "sociedad financiera de objeto múltiple" (multiple-purpose financial institution) or its acronym, "SOFOM", followed by the words "entidad no regulada" (non-regulated entity) or its acronym, "E.N.R." The non-regulated multiple-purpose financial institutions will not be subjected to the supervision of the National Bank and Securities Commission.

EX - DUARTE JAQUEZ - 001016

Public Registry of Commerce of the state under the electronic commercial page number 24139.

While he was a public servant, **CÉSAR HORACIO DUARTE JÁQUEZ** was a partner and shareholder in different companies and businesses, some of which he even co-owned along with this brothers, Ricardo, Alejandro and Mario, all of whom have the last names **DUARTE JÁQUEZ**, such as the corporation called "Grupo Inmobiliario del Norte", S.A. de C.V. Also, along with his wife, Bertha Olga Gómez Fong, and his children, César Adrian, Bertha Isabel and Olga Sofia, all of whom have the last names Duarte Gómez, they were shareholders in the company called "Ganadera El Saucito Balleza", S.P.R. de R.L. de C.V." The accused and his former sister-in-law, Blanca Estela Álvarez, were shareholders in Financiera.

The accused also had ties with Carlos Gerardo Hermosillo Arteaga, who was part of the former governor's close circle and who worked as public servant in different offices for the Government of Chihuahua during **CÉSAR HORACIO DUARTE JÁQUEZ**'s term. Carlos Gerardo Hermosillo Arteaga was a shareholder and Legal Representative of Financiera of which, as mentioned previously, **CÉSAR HORACIO DUARTE JÁQUEZ** was a founder, main shareholder and president of the Administration Board.

Within the criminal case there is a statement made by witness identified with the code 56RT65PW726, who stated that **CÉSAR HORACIO DUARTE JÁQUEZ** met Carlos Gerardo Hermosillo Arteaga in 1999 and appointed him Secretary of the Internal Revenue Service in Chihuahua, in October 2012, serving until the end of his term.

The witness stated that Carlos Gerardo Hermosillo Arteaga spent a lot of time with and was close to **CÉSAR HORACIO DUARTE JÁQUEZ** for many years because he had been close friends with him and his father since he was young. When Carlos Gerardo

Hermosillo Arteaga's father died, the accused exercised some sort of informal guardianship over him, supporting him financially and morally.

**CÉSAR HORACIO DUARTE JÁQUEZ** educated Carlos Gerardo Hermosillo Arteaga according to his needs and requirements. At the same time, the latter put all his trust in him for the operation and execution of his most delicate and personal issues in the widest possible sense. This closeness between them is corroborated by several of the testimonies collected, but it is obvious when reviewing the participation in the shares because, along with **CÉSAR HORACIO DUARTE JÁQUEZ**, he has shares in Unión Ganadera, where Carlos Gerardo Hermosillo Arteaga was the Legal Representative.

It is worth mentioning that, pursuant to the information found within the criminal case, Carlos Gerardo Hermosillo Arteaga died in Chihuahua on March 20, 2017 during a car accident.

**CÉSAR HORACIO DUARTE JÁQUEZ** did not fulfill his obligations as a public servant because, as a governor, he had to manage the state's assets efficiently, effectively, economically, transparently and honestly in order to satisfy the objectives for which they were intended, and to apply them impartially, pursuant to Article 134, paragraph first of the Political Constitution of the United Mexican States; Article 93 section XXXIV of the Political Constitution of the State of Chihuahua and Article 5, paragraph first of the Law of Expense Budgets, Government Accounting and Public Expenses of the State of Chihuahua.

In the aforementioned legislation, it is established that the state government, in order to satisfy society's needs and demands, prepares grant agreements and hiring with different individuals and corporations, using public economic resources whose use is not discretionary or arbitrary by the state servants. In this regard:

7

all servants in the state government, mainly its Governor as the holder of the executive power, are required to:

a.   Administer the public patrimony efficiently, effectively, economically, transparently and honestly to satisfy the objectives for which they were intended, as established in Article 93, section XXXIV of the Political Constitution of the State of Chihuahua and Article 134, paragraph first of the Political constitution of the United Mexican States.

b.   Apply public resources under its responsibility impartially, as established by Article 83 ter, paragraph second of the Political Constitution of the United Mexican States.

c.   Exercise the Public Expense pursuant to the guidelines, directives, strategies and goals, based on the principles of efficiency, effectiveness, economy, honesty, rationality, austerity, control, accountability, gender equality and transparency in theadministration of public resources, in order to satisfy the needs required by the development of the State, pursuant to Article 5, paragraph first of the Expense, Government Accounting and Public Expense Budget in the State of Chihuahua.

Pursuant to the federal and state legislation, all payments charged to the budget made by the servants must be justified and proven, which did not occur with the payments made to Unión Ganadera and Financiera, as it will be explained later.

Pursuant to the Law of Responsibilities of Public Servants in the State of Chihuahua, all public servants must abstain from requesting, accepting or improperly receiving, by

themselves or through intermediaries, money or any other gift or service for themselves or for third parties. Mainly, **CÉSAR HORACIO DUARTE JÁQUEZ**, who was the governor, should have abstained from signing agreements or contracts, or from exercising public expenses under a conflict of interests, which laid in the fact that he had shares in companies at which he was a partner and president and, at the same time, he was a partner at Unión Ganadera. Those companies were directly benefited from the state's resources.

An investigation performed by the state authorities revealed that, in August 2018, due to a review in state accounting performed by the Internal Revenue Service, multiple millionaire contracts were identified during the years 2011, 2012, 2013 and 2014, which favored Unión Ganadera and Financiera.

It is worth mentioning that said corporations were under the direct control of **CÉSAR HORACIO DUARTE JÁQUEZ** because he was the president of the Board of Directors and the Administration Board of the former and the majority shareholder of the latter. Therefore, he had a personal and business interest that produced a conflict of interest.

Serious irregularities were identified during the investigation, which proved that fraudulent administrative procedures were used to deliver the public money to the corporations linked to **CÉSAR HORACIO DUARTE JÁQUEZ**, which were informed to the Secretariat of Public Service of the State of Chihuahua, pointing out:

(A)   That the payments were made mostly based on alleged economic / financial support agreements and a loan contract with interests, which were signed at different times during the years 2011, 2012, 2013 and 2014, with the aforementioned corporations being involved. The state-owned entity called Fideicomiso Estatal para el Fomento de las Actividades Productivas en Chihuahua (State Trust for the Promotion of Productive Activities in

9

Chihuahua), part of the Secretariat of Economy (FIDEAPECH), the Secretariat of Rural Development and the Internal Revenue Service of the State of Chihuahua:

**(B)**   That the administrative procedures to make the payments show multiple irregularities: incomplete documentation, unfinished procedures, inconsistencies in dates, concepts and amounts, violation of legal procedures to grant subsidies (economic / financial support) and hiring, emphasizing the obvious conflict of interest between the then-Governor, as the main administrator of the state's patrimony and the corporations for which he also controlled the patrimony; and

**(C)**   Mainly, that in the files of the secretariats involved, there is no evidence of the fulfillment of the economic and financial backup granted, and the loan contract signed by the corporations associated with **CÉSAR HORACIO DUARTE JÁQUEZ**. In other words, there is no evidence that the state money at issue has been used for public purposes.

The payments made to Unión Ganadera and Financiera linked to **CÉSAR HORACIO DUARTE JÁQUEZ** amount to $96,685,253.80 Mexican pesos, of which $64,685,253.80 Mexican pesos were delivered to Unión Ganadera and $32,000,000.00 Mexican pesos were given to Financiera in the following manner:

EX - DUARTE JAQUEZ - 001021

| DATE OF PAYMENT | TOTAL AMOUNT | OFFICE ISSUING THE RESOURCE | BENEFITTED COMPANY |
|---|---|---|---|
| 06/17/2011 | $ 582,965.80 | Internal Revenue Service | UNIÓN GANADERA |
| 01/10/2012 | $12,000,000.00 | Internal Revenue Service | FINANCIERA |
| 01/10/2012 01/25/2012 03/15/2012 | $36,000,000.00 | Internal Revenue Service | UNIÓN GANADERA |
| 09/25/2012 | $ 8,000,000.00 | Internal Revenue Service | FINANCIERA |
| 10/04/2012 10/04/2012 | $12,000,000.00 | Internal Revenue Service | FINANCIERA |
| 04/25/2012 | $ 2,692,288.00 | Internal Revenue Service | UNIÓN GANADERA |
| 01/09/2012 | $ 5,000,000.00 | Internal Revenue Service | UNIÓN GANADERA |
| 07/12/2012 | $10,000,000.00 | Internal Revenue Service | UNIÓN GANADERA |
| 10/18/2013 | $ 4,600,000.00 | Internal Revenue Service | UNIÓN GANADERA |
| 04/01/2013 | $ 250,000.00 | Internal Revenue Service | UNIÓN GANADERA |
| 10/18/2013 | $ 60,000.00 | Internal Revenue Service | UNIÓN GANADERA |
| 11/28/2014 11/28/2014 11/28/2014 | $ 5,500,000.00 | Internal Revenue Service | UNIÓN GANADERA |

GENERAL
TOTAL
$96,685,253.80

The analysis of the available proof shows that the irregular procedures and operations for the payments made to the companies linked to **CÉSAR HORACIO DUARTE JÁQUEZ** are:

1. **GRANT NUMBER 352/2011 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR $582,965.80 MEXICAN PESOS.**

On June 1, 2011, the Secretariat of Rural Development, the Internal Revenue Service and Unión Ganadera signed the Grant Agreement 352/2011 for the amount of $582,965.80 Mexican pesos, in order to acquire the equipment necessary for the artificial insemination of beef cattle in support of the producers affiliated to Unión Ganadera.

Because of this, on June 17, 2011, the agreed amount was paid with the check number 011876 from the account number ███████ of Santander México S.A., registered under the name of the Internal Revenue Service of the Government of the State of Chihuahua; to the credit of the account number ██████ of HSBC México S.A., registered under the name of Unión Ganadera.

The investigation performed by law enforcement authorities in the State of Chihuahua shows that, the signing of the aforementioned agreement was fraudulent and there is no documentation or information through which Unión Ganadera can prove that the grant was used for the purpose established in the contract. There is also an absence of invoices that credit the purchase of the equipment under the agreement.

Within the investigation file, there is a report on the bank accounts analyzed, which was prepared by a financial expert, and there is a technical financial-accounting report issued by the Secretariat of Public Service of the State of Chihuahua, which proves the traceability of the public resources given to Unión Ganadera. Also, it has been confirmed that the procedure to embezzle money from Chihuahua in order to satisfy the interests of **CÉSAR HORACIO DUARTE JÁQUEZ** was fraudulent because it

was not used for the purposes intended and it was destined to the direct benefit of his wife, Bertha Olga Gómez Fong, through her construction company called "Pavimentos y Servicios de Parral", S.A. de C.V.

Once Unión Ganadera received the money from the agreement in its accounts, it transferred $50,000.00 and $517,802.52 on June 20 and 27th to the account registered under the name of "Pavimentos y Servicios de Parral", S.A. de C.V., which belongs to Bertha Olga Gómez Fong, who also used the money to make a payment on the credit card number ██████████, issued by American Express Company (México) S.A. in favor of Bertha Olga Gómez Fong. The payment was for the amount of $43,844.75 Mexican pesos and afterwards, to make a payment for $19,090.00 Mexican pesos in favor of Víctor Hugo Maldonado Gachupín, a worker of the "El Milagro" ranch, owned by **CÉSAR HORACIO DUARTE JÁQUEZ**, allegedly to make payroll payments and make payments for the ranch.

The Superior Audit for the State of Chihuahua analyzed the procedure performed to sign the grant agreement and determined that it had been fraudulent because it violated several legal provisions related to the handling of public resources.

This is corroborated by the statements of the witnesses identified as KA5P23/2019, 5M4GYUH19A/2019 and FE54HD7SHJW/2019, which are within the investigation file.

2. **GRANT WITH WORK NUMBER 6800685 IN FAVOR OF FINANCIERA DE LA DIVISIÓN DEL NORTE, S.A. DE C.V., SOFOM, ENR FOR $9,210,000.00 AND $2,790,000.00 MEXICAN PESOS**

On October 4, 2011, the Internal Revenue Service of the State of Chihuahua made 2 payments in favor of Financiera for the amounts of $2,790,000.00 and $9,210,000.00

Mexican pesos, charged to the account number ▮▮▮▮▮▮▮ of Santander México S.A., which is registered under the name of the Internal Revenue Service; and to be paid to the account number ▮▮▮▮▮▮▮ of Santander México S.A., which is registered under the name of Financiera. The concept of this operation was a grant, with Work Number 6800685. The justification of these payments was attempted through the agreement called "Subsidy for the Acquisition of Meat-Producing Heifers", which was made with the purpose of acquiring meat-producing heifers. The aforementioned agreement was signed by the State of Chihuahua, represented by the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera.

In that particular case, there is no documentation or information to prove that the grant given to Unión Ganadera was used for the purpose established in the agreement. Also, there are no documents or information regarding the validation of the register of beneficiaries and suppliers; the documentation that credits the social impact of the program; the certificates of delivery and receipt signed by the beneficiaries, the intermediate entity and the secretariat; the information regarding the quarterly reports of the programming, budgetary and financial progress of the program; or the quarterly monitoring of the Regulation and Monitoring Committee to track the progress of the fulfillment of the object.

The traceability or route for the money, analyzed in the Technical Financial-Accounting Report from May 9, 2019, which was prepared by a financial expert, confirms that the grant was only a simulation, because said resource was not used for the alleged purpose of the agreement. Also, the public money that was embezzled was used to fund a Trust in the name of **CÉSAR HORACIO DUARTE JÁQUEZ** and his wife, Bertha Olga Gómez Fong, and it was also transferred to a construction

company whose shareholders are people who are associated with **CÉSAR HORACIO DUARTE JÁQUEZ.**

Also, on October 10, 2011, a payment was made for $10,000,000 Mexican pesos using check number 220, charged to the account number ▌▌▌▌ of Santander México S.A., which is registered under the name of Financiera. The money was credited to the account number ▌▌▌▌ of HSBC México S.A., which is registered under the name of Akalá, S.A. de C.V. S.F.P. The money left this account and was used on the Trust number ▌▌▌ from Banco Mercantil del Norte S.A., which is registered under the name of **CÉSAR HORACIO DUARTE JÁQUEZ** and Bertha Olga Gómez Fong, according to bank documents.

A second payment was made on October 12, 2011 for the amount of $2,000,000.00 Mexican pesos from the account number ▌▌▌▌ of Santander México S.A., which is registered under the name of Financiera, and on December 14, 2011, a payment was made for the same amount of $2,000,000.00 from the account number ▌▌▌▌ of Santander México S.A., which is registered under the name of Financiera. These payments were credited to Finca Ingeniería Integral S.A. de C.V., which is a company dedicated to construction and the administration of civil work, and César Humberto Javalera Leal and Raúl Enrique Javalera Leal were benefited. These people are witnesses of the sale of the property called "Rancho Santa Rita", and **CÉSAR HORACIO DUARTE JÁQUEZ**'s partners in Financiera.

This is corroborated by the statements of the witnesses identified as KA5P23/2019, 5M4GYUH19A/201 and FE54HD7SHJW/2019, which are within the investigation file.

EX - DUARTE JAQUEZ - 001026

Specifically, what was stated by 5M4GYUH19A/201, who said that he worked as the General Director of Investment Programs in the Internal Revenue Service during **CÉSAR HORACIO DUARTE JÁQUEZ**'s administration. Therefore, he is in conditions of confirming that the grant procedures mentioned in this point were simulated and that the payment made was inappropriate. He can also say that, according to his powers, he signed part of the documentation prepared to release the public funds, as per the request of Carlos Gerardo Hermosillo Arteaga on behalf of **CÉSAR HORACIO DUARTE JÁQUEZ**.

3. **GRANT WITH WORK NUMBER 6800685 IN FAVOR OF FINANCIERA DE LA DIVISIÓN DEL NORTE", S.A. DE C.V., SOFOM, ENR FOR $12,000,000.00 MEXICAN PESOS.**

On January 10, 2012, the Internal Revenue Service made a payment of $12,000,000.00 Mexican pesos in favor of Financiera, through check number 016465 debited to account number ▇▇▇▇▇▇▇▇ of Santander México S.A., which is registered under the name of the Internal Revenue Service. The payment was credited to the account number ▇▇▇▇▇▇▇ of Santander México S.A. for a grant for the Work number 6800685, as an alleged "Subsidy for the Acquisition of Meat-Producing Heifers", which was used to justify the irregular exit of money.

The payment of the subsidy was processed by the then-General Director of Investment Programs of the Internal Revenue Service who, in his capacity as officer, signed part of the documentation prepared to release the public funds at the request of Carlos Gerardo Hermosillo Arteaga who, in turn, requested it on behalf of **CÉSAR HORACIO DUARTE JÁQUEZ**. The then-General Director of Investment Programs of the Internal Revenue Service made a statement identified under the identity protection code 5M4GYUH19A/2019. In it, he stated that, when he signed

the aforementioned notice, he had the authorization of the then-Secretary of the Internal Revenue Service, who is identified as KA5P23/2019.

5M4GYUH19A/2019 also stated that the grant was granted inappropriately to Financiera, simulating that it would be used for public purposes when it was actually going straight to the patrimony of **CÉSAR HORACIO DUARTE JÁQUEZ**. Also, the procedure took place outside the established ordinary procedure, but it was rushed even though there were priority transactions that had been scheduled before. The expense was debited from the debtor account because, obviously, the documentation needed to prove the exit of the resource did not exist. This was not correct because it was not an urgent payment caused by some sort of contingency. This means that the nature of said debtor account was distorted only to facilitate the exit of the resource.

According to the Technical Financial-Accounting Report dated May 9, 2019, the traceability or money route confirms that the grant was only a simulation, given that on October 11, 2011, a payment was made for the amount of $12,000,000.00 Mexican pesos, which were debited from the account number ▮▮▮▮▮▮▮ of Santander México S.A., which is registered under the name of Financiera. The money was released on January 24, 2012. On that same date, 5 payments for the amount of $2,544,815.00 Mexican pesos each were made, which amounted to a total of $12,724,075.00 Mexican pesos, debited from the account number ▮▮▮▮▮▮ of Santander México S.A., which is registered under the name of Financiera de la División del Norte S.A. de C.V and credited to Financiera Rural.

Financiera Rural is a rural development banking institution which is part of the Federal Government, sectorized in the Federal Internal Revenue and Public Credit Service (SHCP), which, according to the law that regulates it, grants credits to

producers and financial intermediaries. According to the investigations, the money from the alleged support to buy heifers was used to make payments to Financiera.

This is corroborated through the statements made by the witnesses identified as KA5P23/2019, 5M4GYUH19A/2019 and FE54HD7SHJW/2019. Their statements are within the criminal case against **CÉSAR HORACIO DUARTE JÁQUEZ**. They stated that they were part of **CÉSAR HORACIO DUARTE JÁQUEZ**'s office, which is why they are aware of the information mentioned.

4.   **LOAN CONTRACT WITH INTEREST NUMBER 887/2011 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR THE AMOUNT OF $5,000,000.00 MEXICAN PESOS.**

On November 14, 2011, the loan contract with interest 887/2011 was signed by the Government of Chihuahua, which was represented by the Internal Revenue Service and the Secretariat of Rural Development, in favor of Unión Ganadera, for the amount of $5,000,000.00 Mexican pesos, to be paid in one lump sum before June 30, 2013. There was also a possibility of early payments for an alleged "loan" made to Unión Ganadera for work capital.

On January 9, 2012, a payment was made for $5,000,000.00 Mexican pesos using check number 000047, charged to the account number ▮▮▮▮▮▮ of Santander México S.A., which is registered under the name of the Internal Revenue Service. The money was credited to the account number ▮▮▮▮▮▮ of HSBC México S.A., which is registered under the name of Unión Ganadera.

In this particular case, the evaluation performed by the Superior Audit of the State shows that important irregularities were detected. This includes the lack of budget sufficiency, which violates what is established in the programs that grant subsidies such as the Operation of the State Program for the Development of Agricultural, Agroindustrial and Forestry Producers (PRODAAF). Also, the amount granted as credit exceeded the maximum funding amount and the term established, and, similar to the other cases, there is no documentation regarding the payment of the loan in question.

Regarding the traceability of the resources[2], the analysis shows that the money was not used pursuant to what was stated in the contract and that it also produced benefit in favor of **CÉSAR HORACIO DUARTE JÁQUEZ** and those close to him.

Within the investigation file, there is information saying that, out of the $5,000,000.00 Mexican pesos from the loan, $561,340.00 were given on January 18, 2012 to Raúl Yáñez Bustillos as payment for the livestock sold to Carlos Gerardo Hermosillo Arteaga. On January 23, 2012, a payment of $3,000,000.00 was made to purchase a ranch from the then-Governor's family company, "Nueces la Esperanza S.A. de C.V.", and one million pesos were deposited into a savings account in the financial institution "Akalá, S.A. de C.V. S.F.P." Lastly, on January 25, 2012, a payment of $1,000,000.00 Mexican pesos was made to that company's account.

The money embezzled was under legal availability and was under the responsibility of the public servants involved, i.e., **CÉSAR HORACIO DUARTE JÁQUEZ**, the Secretary of the Internal Revenue Service, the Treasurer of the Internal Revenue Service, the head of the department of Payment Scheduling and Control of the Internal Revenue Service, the Secretary of Rural Development and the Director of

---

[2] Technical Financial-Accounting Report from May 9, 2019. **(EXHIBIT 19)**

Agricultural Promotion of the Secretariat of Rural Development. Due to their positions, they had the powers that allowed them to make binding decisions regarding the handling and destination of the resources mentioned.

All of this may be corroborated through the statements of witnesses KA5P23/2019, 5M4GYUH19A/2019, Joaquín Francisco Hernández Vega, FE54HD7SHJW/2019 and Juan Rubén Barrio Garza.

5. **GRANT NUMBER 991/2011 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR $36,000,000.00 MEXICAN PESOS.**

On December 1, 2011, the Financial Support Agreement 991/2011 was signed by the Secretariat of Rural Development, the Internal Revenue Service and Unión Ganadera for an alleged "indemnity payment for producers that transport their non-productive livestock to the meat processing plant to be sacrificed", for the amount of $36,000,000.00 Mexican pesos.

On January 10, 2012, a payment was made for $16,000,000.00 Mexican pesos, through check number 016464, in favor of Unión Ganadera. Then, on January 25, 2012 and March 15, 2012, other 2 payments were made for $10,000,000.00 Mexican pesos in favor of Unión Ganadera through checks 017104 and 016781, respectively.

In this case, in addition to the irregularities in the procedures, there is also a lack of documentation and information through which Unión Ganadera can prove that the grant was used for the agreed purpose. Even though the Secretariat of Rural Development was working with a list of people who could be suggested as "alleged beneficiaries", there were no attachments with personal identifications or any other

information corroborating the participation of the beneficiaries or the list of beneficiaries to whom the support was going.

The list of people in the administrative files of the agreement in question identified the alleged signatures of 45 people but, after investigating, it was determined that they were deceased at the time when the alleged support was provided. Therefore, it was impossible for them to sign the documents and the falseness of the document and the proceeding to release the funds to Unión Ganadera División del Norte is obvious. In other words, the list had signatures of people who were dead at the time when the documents were prepared.

Also, the statements found within the criminal case show that Enrique Alvarado Moreno, Manuel Ramírez Vázquez, Mario Fierro Tarango, Juventino Peña Armendáriz, José Heriberto Aguilar Murga and David Olivas Aguilar stated that they did not recognize the signatures in the list of beneficiaries as theirs and that they did not receive the amount of support mentioned in it. This means that said signatures were falsified.

This may be corroborated through the statements made by the witnesses KA5P23/2019, FE54HD7SHJW/2019, 5M4GYUH19A/2019. The latter in particular was the General Director of Investment Programs in **CÉSAR HORACIO DUARTE JÁQUEZ**'s administration and said that this grant procedure was irregular because it was granted following his instructions. The witness said that Carlos Gerardo Hermosillo Arteaga talked to him a few days before signing the document, giving him the instructions of the then-governor, even though there was no documentation to prove the release of funds. Still, Carlos Gerardo Hermosillo Arteaga was pressuring him to move the procedure forward, registering the expense in the debtor account because there was no supporting documentation.

6. **GRANT NUMBER 305/2012 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR $2,692,288.00 MEXICAN PESOS.**

On April 19, 2012, the Secretariat of Rural Development, the Internal Revenue Service and Unión Ganadera signed the Grant Agreement 305/2012 for the amount of $2,692,288.00 Mexican pesos, in order to allegedly "acquire 116 (one hundred and sixteen) pieces of equipment for artificial insemination with the purpose of increasing the genetic quality of the beef", in support of the producers affiliated to said Unión Ganadera.

On April 25, 2012, a payment was made for $2,692,288.00 Mexican pesos using check number 017910, charged to the account number        of Santander México S.A., which is registered under the name of the Internal Revenue Service. The money was credited to the account number      of HSBC México S.A., which is registered under the name of Unión Ganadera.

This may be corroborated through the statements made by the witnesses 5M4GYUH19A/2019, Guillermina Hernández Vázquez, FE54HD7SHJW/2019 and NI37SC94WQ/ 2019.

Also, there is a statement made by the witness identified as 56RT65PW7, who was the Secretary of the Internal Revenue Service and who said that, in early 2013, **CÉSAR HORACIO DUARTE JÁQUEZ** requested, expressly and directly, along with Octavio Legarreta, the then-Secretary of Rural Development, at a meeting in the Government House, to perform all the necessary proceedings to withdraw over $2,500,000.00 Mexican pesos from the account. This money had been given in 2012

to Unión Ganadera as a grant for the producers who were part of it to acquire thermos for artificial insemination.

Octavio Legarreta told witness 56RT65PW7 that the job the governor had asked for was almost ready to verify and withdraw the payment granted to Unión Ganadera from the debit account. Leonel De Las Casas, then-Director of Rural Planning and Roberto Ditrich Nevarez, then-Director of Agricultural Development, both part of the Secretariat of Rural Development, had to prepare the file with some simulated documents or documents prepared in that way to send them to the Internal Revenue Service.

Days later, the Secretariat of Rural Development submitted documentation to the Internal Revenue Service in an attempt to try and back up the expense. Among this documentation was a list of the municipalities that were supposedly benefited. However, that was not enough to back up the expense. This situation forced the Secretariat of Rural Development to issue other documents in the first months of 2014 and 2015. At the insistence of the governor, **CÉSAR HORACIO DUARTE JÁQUEZ**, the expense had accounting backup and the record was eliminated from the Miscellaneous Debtors account.

The traceability[3] of the public resources confirms that they were not used pursuant to their purpose because the $1,112,698.08 Mexican pesos were sent to corporations linked directly to **CÉSAR HORACIO DUARTE JÁQUEZ** as follows: on April 27, 2012, a payment for $612,698.08 Mexican pesos was made through check number 000308, debited from the account number ████████ of HSBC México S.A., which is registered under the name of Unión Ganadera. The payment was credited to "Genera Proyectos Agroindustriales Inmobiliarios" S.A. de C.V., which belonged to

---

[3] Technical Financial-Accounting Report from May 9, 2019.

Ruth Sarahí Martínez Mariscal, an employee of **CÉSAR HORACIO DUARTE JÁQUEZ** at Unión Ganadera and at Financiera. She founded said company with her husband, Carlos Rafael Encinas, with the purpose of "obtaining state government resources".

On June 25, 2012, a payment for $500,000.00 Mexican pesos was made through check number 000658, debited from the account number ▮▮▮▮▮ of HSBC México S.A., registered under the name of Unión Ganadera, and credited to "Valles Baca Hermanos S.P.R. de R.L. de C.V.". The shareholders in said corporation are associated to **CÉSAR HORACIO DUARTE JÁQUEZ**.

7. **GRANT NUMBER 376/2012 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR $10,000,000.00 MEXICAN PESOS.**

On May 25, 2012, Grant Agreement 376/2012 is signed by, on the one hand, the state government, represented by the Internal Revenue Service and the Secretariat of Rural Development, and on the other hand, by Unión Ganadera, for the amount of $10,000,000.00 Mexican pesos, which was supposed to be used to "acquire food for cattle".

On July 12, 2012, a payment was made for $10,000,000.00 Mexican pesos using check number 018552, charged to the account number ▮▮▮▮▮ of Santander México S.A., which is registered under the name of the Internal Revenue Service for the State of Chihuahua. The money was credited to the account number ▮▮▮▮▮ of HSBC México S.A., which is registered under the name of Unión Ganadera.

EX - DUARTE JAQUEZ - 001035

Pursuant to the bank information found within the criminal case, which was analyzed by a financial expert[4], it was confirmed that the money from the subsidy was not used as it should have, and it also benefitted **CÉSAR HORACIO DUARTE JÁQUEZ** and/or those close to him. This can be corroborated by analyzing the transactions. For example, on August 10, 2012, a payment for $1,360,000.00 Mexican pesos was made through check number 000665, debited from the account number ▇▇▇▇ of HSBC México S.A., registered under the name of Unión Ganadera, and credited to "Valles Baca Hermanos S.P.R. de R.L. de C.V.". The shareholders in said corporation are associated to **CÉSAR HORACIO DUARTE JÁQUEZ**.

On August 13, 2012, another payment for $3,987,500.00 Mexican pesos was made through check number 000666, debited from the account number ▇▇▇▇ of HSBC México S.A., registered under the name of Unión Ganadera, and was credited to Grupama S.A. de C.V. (whose taxpayer registration number is GRU0109252R7). This company is dedicated to the wholesale trade of fertilizers, pesticides and sowing seeds, and not to purchasing cattle feed.

Another payment was made on August 28, 2012 for $2,652,500.00 Mexican pesos through check number 000672, debited from the account number ▇▇▇▇ of HSBC México S.A., which is registered under the name of Unión Ganadera. It was credited to Francisco Javier Diaz Batrez, who was pointed out by the Tax Administration Service (SAT) as an EFO (company that charges for simulated operations).[5]

---

[4] Technical Financial-Accounting Report from May 9, 2019.
[5] Pursuant to the Federal Tax Code, when the tax authorities detect that a taxpayer has been issuing invoices without having the assets, staff, infrastructure or material capacity, directly or indirectly, to render the services or to produce, commercialize or deliver the assets included in said invoices or if said taxpayers are not located, it will be presumed that the operations covered by said invoices do not exist.

[...]

The effects of the publication of this list will be to consider, with general purposes, that the operations contained in the tax invoices issued by the taxpayer in question do not produce or did not produce any tax effect.

EX - DUARTE JAQUEZ - 001036

Lastly, on August 29, 2012, a payment for $2,000,000.00 was made through check number 000673, debited from the account number ███████ of HSBC México S.A., registered under the name of Unión Ganadera, and it was credited to "Promotora Ganadera del Real" S.A. de C.V. (whose taxpayer identification number is PGR960712UU7), for the purchase that Carlos Gerardo Hermosillo Arteaga made of a property used as a meat processing plant from the shareholders of said corporation.

This may be corroborated through the statements made by the witnesses identified as 5M4GYUH19A/2019 and FE54HD7SHJW/2019.

8.    **PAYMENT IN FAVOR OF FINANCIERA DE LA "DIVISIÓN DEL NORTE", S.A. DE C.V., SOFOM, ENR, FOR $8,000,000.00 MEXICAN PESOS, TO PURCHASE A BUILDING.**

On September 25, 2012, a payment was made for $8,000,000.00 Mexican pesos through an electronic transfer charged to the account number ███████ of Santander México S.A., which is registered under the name of the Internal Revenue Service. The money was credited to the account number ███████ of Banco Mercantil del Norte S.A., which is registered under the name of Financiera.

As per the instructions of **CÉSAR HORACIO DUARTE JÁQUEZ**, his collaborators pretended to justify said payment under the concept of an acquisition. They tried to make it appear as if the Government of Chihuahua had acquired an urban lot located at the Guillermo Prieto street, number 4, in the corner with the Mercaderes street, in Hidalgo del Parral, Chihuahua.

The investigations performed by the technical body in charge of the supervision of public expenses in Chihuahua, which is the Superior Audit, show that the procedure performed to obtain the payment was fraudulent because it violated several legal provisions related to the handling of public resources.

The analysis of the elements of proof shows that the payments lack a valid justification because on September 25, 2012, the Internal Revenue Service made a transfer to the account number ▮▮▮▮▮▮▮▮ for $8,000,000.00 Mexican pesos, which appeared that same day under page 9040077, as seen on the statement for the period comprised from September 1 to 30, 2012 for the account number ▮ ▮▮▮▮▮▮▮, of the same bank, Santander S.A., which is registered under the name GOB EDO CHIH SECRETARIA DE HACIENDA OBRA PUBLICA (Government of the State of Chihuahua, Internal Revenue Service, Public Works).

On that same date, Carlos Gerardo Hermosillo Arteaga signed a document saying he was receiving $8,000,000.00 Mexican pesos from the Government of Chihuahua for expenses to be proven for the acquisition of a building from Financiera. However, there is no evidence or documentation to back up the purchase of the building for that amount from the owners, Consuelo García Chávez and Luz María Torres García.

Therefore, there was no reason to make the payment to Financiera because there is no evidence that the sellers of the asset requested it or rather, that any agreement took place between the Government of Chihuahua and the aforementioned Financiera or between the latter and the sellers.

According to the bank accounts that were studied by a financial expert, the traceability[6] or the route that the money took confirms that the payment was only a

---

[6]Technical Financial-Accounting Report from May 9, 2019.

simulation because the resource was not used for the supposed purpose of the agreement. It also produced a direct and immediate benefit for **CÉSAR HORACIO DUARTE JÁQUEZ**. For example, on October 31, 2012, a payment for $9,000,000.00 Mexican pesos was made through check number 000895, debited from the account number ███████ of Banco Mercantil del Norte S.A., registered under the name of Financiera, and credited to the account number ███████, registered under the name of "Akalá" S.A. de C.V. S.F.P., which belongs to Carlos Gerardo Hermosillo Arteaga.

That same day, two other deposits were made into the account number ███████ for "Akalá" S.A. de C.V. S.F.P., which belongs to Carlos Gerardo Hermosillo Arteaga, for the amounts of $5,000,000.00 Mexican pesos and $6,000,000.00 Mexican pesos, which, along with the $9,000,000.00 Mexican pesos mentioned above, totaled the amount of $20,000,000.00 Mexican pesos, which were deposited on that date into the account number ███████ of HSBC México S.A., registered under the name of "Unión de Crédito Progreso" S.A. de C.V. The money was deposited into the Trust number ███████ of Banco Mercantil del Norte S.A., which is registered under the name of **CÉSAR HORACIO DUARTE JÁQUEZ** and Bertha Olga Gómez Fong. This last information was obtained from a net worth statement made by the accused when he was the governor.

This is corroborated through the statements made by the witnesses identified as 56RT65PW7, Guillermina Hernández Vázquez, FE54HD7SHJW/2019, who worked at the Internal Revenue Service and therefore, have sufficient knowledge to give a statement regarding the embezzlement of the funds requested by **CÉSAR HORACIO DUARTE JÁQUEZ**, and operated by Carlos Gerardo Hermosillo Arteaga.

EX - DUARTE JAQUEZ - 001039

9.  **GRANTS NUMBER 384/2013 AND 0426/2013 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR $250,000.00 AND $60,000.00 MEXICAN PESOS, RESPECTIVELY.**

On April 1, 2013 and October 18, 2013, respectively, the Internal Revenue Service issued checks in favor of Unión Ganadera for $250,000.00 and $60,000.00 Mexican pesos. There was an attempt to irregularly justify the payments through the Grant Agreements numbers 384/2013 and 426/2013, whose purpose was to "defray the expenses to transport exhibition cattle to the San Marcos Fair in the State of Aguascalientes". The agreements were signed by the Government of Chihuahua, represented by the Internal Revenue Service and the Secretariat of Rural Development and Unión Ganadera.

The traceability[7] of the public resource confirms that it was not used for the purpose mentioned in the agreement, and that it also benefitted **CÉSAR HORACIO DUARTE JÁQUEZ** and/or those close to him, given that several transactions took place. Among these transactions, there was one that took place on April 2, 2013 for $80,000.00 Mexican pesos through check number 000733, debited from the account ▮▮▮▮▮▮▮ of HSBC México S.A., which is registered under the name of Unión Ganadera and it was credited to American Express Company. Another transaction on April 15, 2013 was debited from the same account and credited to Brando S.A. de C.V. There was another transaction for $80,000.00 Mexican pesos on April 16, 2013, which was credited to the account of Ana Lilia Núñez Mendoza and, lastly, there was a transaction on April 17, 2013 for $35,000.00 Mexican pesos, which was credited to Diana Alejandra Rentería Ortiz. None of the people mentioned previously is related or is responsible for the programs for which the subsidy was supposedly created.

---

[7] Technical Financial-Accounting Report from May 9, 2019.

EX - DUARTE JAQUEZ - 001040

Also, the documents mentioned were signed after the money for the agreement was delivered, because on April 1, 2013, check number 1257178 for $250,000.00 Mexican pesos was written in favor of Unión Ganadera, and it was reflected on April 2, 2013 at the statement for the period comprised between April 1 and 30, 2013. The check was issued from the account number ▓▓▓▓▓▓ of BBVA Bancomer S.A., whose registered owner is GOB EDO CHIH SECRETARIA DE HACIENDA (Government of the State of Chihuahua, Internal Revenue Service). The agreement that gives rise to the grant of the money is dated March 26, 2013 and it did not have the necessary signatures at the time when the money was delivered.

This may be corroborated through the statements made by the witnesses identified as 56RT65PW7, FE54HD7SHJW/2019, Guillermina Hernández Vázquez, Irvin Jahir Ontiveros Vásquez, Fernando Tarango Mendoza, Carlos Sancen Contreras and PYRTEJ/2018, which are within the criminal case opened against **CÉSAR HORACIO DUARTE JÁQUEZ.**

10. **GRANT NUMBER 995/2013 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR $4,600,000.00 MEXICAN PESOS.**

On October 18, 2013, the Internal Revenue Service gave Unión Ganadera $4,600,000.00 Mexican pesos. There was an attempt to irregularly justify the payment through the Grant Agreement number 995/2013 dated October 20, 2013, signed, on the one hand, by the Government of Chihuahua, represented by the Internal Revenue Service and the Secretariat of Rural Development, and on the other hand, by Unión Ganadera. The agreement for the amount mentioned was supposed to be for the execution of the Meat-Producing Cattle Repopulation Program in the state.

In this case, according to the information in the bank accounts that were analyzed by a financial expert[8], the fraudulent procedure is confirmed when tracing the route followed by the money given to Unión Ganadera.

There were three money transfers made on October 31, 2013 for $2,049,893.71 Mexican pesos, on November 22, 2013 for $1,586,467.10 Mexican pesos, and on January 7, 2014 for $562,540.66 Mexican pesos, which were all debited from the account number ▮▮▮▮▮▮▮ of HSBC México S.A., which is registered under the name of Unión Ganadera. They were all credited to the account number ▮▮▮▮▮▮▮ of BBVA Bancomer S.A., which is registered under the name of Unión Ganadera.

The foregoing plus other transactions that put the legality of all transactions into question. For example, on January 6, 2014, there was a payment of $562,540.66 Mexican pesos made in favor of "Brando" S.A. de C.V., which is a company connected to **CÉSAR HORACIO DUARTE JÁQUEZ**. This situation was verified through the different investigations made by the authorities of the Public Prosecutor Office in Chihuahua. These investigations include the search warrants that took place in the former governor's residence, in Hidalgo del Parral, Chihuahua.

This may be corroborated through the statements made by the witnesses identified as 56RT65PW7, 5M4GYUH19A/2019, Guillermina Hernández Vázquez, FE54HD7SHJW/2019.

11. **GRANT RECEIVED THROUGH INTERFAZ SIGOS – SFI. GRANT ON PAGES NUMBER CPS-27151/2014, CP-S-27152/2014 AND CP-S-27153/2014 IN FAVOR OF UNIÓN GANADERA REGIONAL GENERAL "DIVISIÓN**

---

[8] Technical Financial-Accounting Report from May 9, 2019. **(EXHIBIT 19)**

**DEL NORTE" DEL ESTADO DE CHIHUAHUA FOR $5,500,000.00 MEXICAN PESOS.**

On November 28, 2014, the Internal Revenue Service gave Unión Ganadera $5,500,000.00 Mexican pesos. There was an attempt to irregularly justify this payment through the simulation of 3 grants in page numbers CP-S-27151/2014, CP-S-27152/2014 and CP-S-27153/2014. The money was supposed to be a grant for the purchase of oatmeal, corn and beans, in support of livestock producers affiliated to Unión Ganadera during November 2014.

There is a discrepancy between the purpose of the grant and the budget sufficiency authorized by the Internal Revenue Service, given that on November 27, 2014, Adrián Dozal Dozal, Director of Administrative Services, prepared and signed the documents called "Government of the State of Chihuahua, Subsidies", which were the notification on page 32-3079/2014, notification on page 32-3080/2014 and notification on page 32-3081/2014. The documents state the same budget application, to be debited from the Budgetary Program 1301700, Definition and Performance of the Planning of Rural Development in activity 2 of component 1.

This may be corroborated through the statements made by the witnesses identified as 56RT65PW7, 67HD6JA9K2S/201, FE54HD7SHJW/2019, Oscar Rene Leos Rodríguez and Sandra Luz Esparza Domínguez, which are within the criminal case.

\* \* \*

EX - DUARTE JAQUEZ - 001043

The 11 points explained above show that the investigations performed by the authorities in the State of Chihuahua found no evidence among the official files to prove the purchase of the materials or services for which the aforementioned agreements were signed and the payments made for oatmeal, corn and beans. Also, it cannot be proven that they were delivered to the beneficiaries, which could verify the veracity of the subsidies.

Even further, pursuant to what was stated by several witnesses, given that there is no documentation to justify the expenditure of the money, the expense was improperly charged to the "debtor account of the government's accounting". This was done in order to leave no evidence of the misappropriate of the resources. The debtor account should have only been used in the event of serious emergencies in the state that would make it essential to make expenses without any proof, such as climate events, natural disasters, etc.

The expense charged to the debtor account was registered temporarily until it was possible to justify it. The public resources embezzled by **CÉSAR HORACIO DUARTE JÁQUEZ** were charged to the debtor account because, once again, when the money was surrendered, there was no justification in most cases.

The effects on the patrimony of Chihuahua due to the payments made in the 11 procedures are reflected in the different bank statements within the criminal case against **CÉSAR HORACIO DUARTE JÁQUEZ**, which are as follows:

| Date of Payment | Total Amount | Withdrawal Account No. | Bank | Withdrawal Account Owner | Total Amount | Deposit Account No. | Bank | Deposit Account Owner |
|---|---|---|---|---|---|---|---|---|
| 06/17/2011 | $582,965.80 | ▉ | Banco Santander, S.A. | Internal Revenue Service | $582,965.80 | ▉ | HSBC México, S.A. | Unión Ganadera |

EX - DUARTE JAQUEZ - 001044

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 01/10/2012 | $12,000,000.00 | 65501899005 | Banco Santander, S.A. | Internal Revenue Service | $12,000,000.00 | ███ | Banco Santander, S.A. | Financiera |
| 01/10/2012 | $16,000,000.00 | | | Internal Revenue Service | | | | |
| 01/25/2012 | $10,000,000.00 | ███ | Banco Santander, S.A. | | $36,000,000.00 | ███ | HSBC México, S.A. | Unión Ganadera |
| 03/15/2012 | $10,000,000.00 | | | | | | | |
| 09/25/2012 | $8,000,000.00 | ███ | Banco Santander, S.A. | Internal Revenue Service | $8,000,000.00 | ███ | Banco Mercantil del Norte, S.A. | Financiera |
| 10/04/2012 | $9,210,000.00 | ███ | Banco Santander, S.A. | Internal Revenue Service | $12,000,000.00 | ███ | Banco Santander, S.A. | Financiera |
| 10/04/2012 | $2,790,000.00 | | | | | | | |
| 04/25/2012 | $2,692,288.00 | ███ | Banco Santander, S.A. | Internal Revenue Service | $2,692,288.00 | *Check 0017910 TIN: UGR051202HB3 | To be confirmed | Unión Ganadera |
| 01/09/2012 | $5,000,000.00 | ███ | Banco Santander, S.A. | Internal Revenue Service | $5,000,000.00 | ███ | HSBC México, S.A. | Unión Ganadera |
| 07/12/2012 | $10,000,000.00 | ███ | Banco Santander, S.A. | Internal Revenue Service | $10,000,000.00 | ███ | HSBC México, S.A. | Unión Ganadera |
| 10/18/2013 | $4,600,000.00 | ███ | Banco Santander, S.A. | Internal Revenue Service | $4,600,000.00 | ███ | HSBC México, S.A. | Unión Ganadera |
| 04/01/2013 | $250,000.00 | ███ | BBVA Bancomer, | Internal Revenue Service | $250,000.00 | ███ | HSBC México, S.A. | Unión Ganadera |

| | | | S.A. | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/18/2013 | $60,000.00 | ▉ | BBVA Bancomer, S.A. | Internal Revenue Service | $60,000.00 | ▉ | HSBC México, S.A. | Unión Ganadera |
| 11/28/2014 | $1,500,000.00 | ▉ | BBVA Bancomer, S.A. | Internal Revenue Service | $5,500,000.00 | ▉ | HSBC México, S.A. | Unión Ganadera |
| 11/28/2014 | $1,500,000.00 | | | | | | | |
| 11/28/2014 | $2,500,000.00 | | | | | | | |

| GENERAL TOTAL | $96,685,253.80 |
|---|---|

The aforementioned $96,685,253.80 Mexican pesos were delivered by the Government of Chihuahua through 17 bank transactions between 2011 and 2014, made to the bank accounts that belonged to the benefitted companies, which were controlled by people in which **CÉSAR HORACIO DUARTE JÁQUEZ** trusted, his accountant, Guadalupe Medina Aragón, and his partner, Hermosillo Arteaga.

Then, the public money was transferred to other bank accounts before being used for non-public purposes, such as **CÉSAR HORACIO DUARTE JÁQUEZ**'s personal expenses (which included the payment of his taxes). It was also used to pay for the expenses of other companies that belonged to him and his family, and to purchase properties for him or for his benefit.

EX - DUARTE JAQUEZ - 001046

Regarding the registration of authorized signatures in the bank accounts that belong to Unión Ganadera, Carlos Gerardo Hermosillo Arteaga is registered in 8 of them, Guadalupe Medina Aragón in 2, and **CÉSAR HORACIO DUARTE JÁQUEZ** in 1. This way, only 2 people whom the former governor absolutely trusted and himself had access to the bank accounts that received the millionaire payments.

Also, **CÉSAR HORACIO DUARTE JÁQUEZ** embezzled the money for his benefit, taking advantage of the structure of the Government of Chihuahua and his position as the holder of the executive power. He used the staff under his command and the means and instruments that belong to the public offices he headed.

All procedures were verified by the Superior Audit of the State, which is the technical entity in charge of supervising public expenses. The audit verified that the expenses were fraudulent because they violated several legal provisions regarding the handling of public resources. According to the aforementioned Superior Audit of the State, granting the resources to the corporations in question was unfounded due to a conflict of interest, because, when the agreement was signed, **CÉSAR HORACIO DUARTE JÁQUEZ** was serving as the Constitutional Governor of Chihuahua and was also the president of the Board of Directors of Unión Ganadera. This conflict of interest produced a personal gain or unjust benefit for **CÉSAR HORACIO DUARTE JÁQUEZ**.

Another thing worth mentioning is that some of the behaviors of **CÉSAR HORACIO DUARTE JÁQUEZ** allowed to verify the existence of a group of people who is dedicated to the organized and repeated execution of criminal acts. In this case, it is consistent in the embezzlement and provision of public money through the use of the structure of the Government of Chihuahua.

EX - DUARTE JAQUEZ - 001047

Said people were hierarchically organized along with **CÉSAR HORACIO DUARTE JÁQUEZ**, who did management work, and the people close to him, forming a criminal structure to steal assets that belonged to the state, using public servants and people outside public service. The purpose of this organization was the organized and repeated execution of criminal acts. In particular, the embezzlement and provision of public money through the use of the structure of the Government of Chihuahua.

In particular, the purpose of this group's crimes was reflected in the crimes committed and investigated within this criminal case, which took place between 2011 and 2014. In that period, 11 fraudulent administrative procedures took place to embezzle funds from the Government of Chihuahua, to both Unión Ganadera and Financiera, where **CÉSAR HORACIO DUARTE JÁQUEZ** had a personal and business interest.

It should not be overlooked that the criminal case contains more than 20 statements made by people who have said that, from 2010 to 2016, when **CÉSAR HORACIO DUARTE JÁQUEZ** was working as Governor for the State of Chihuahua, the witnesses worked for the Internal Revenue Service and the Secretariat of Rural Development, which is why they are aware of the facts described. Therefore, it is worth highlighting the statement made by Guadalupe Siqueiros Tarango, who was Secretary during the 2005 to October 2010 period. He then was a Delegate from 2010 to 2016 and is currently President of the Board of Directors of Unión Ganadera, after being appointed in 2017. The aforementioned person emphasized that Unión Ganadera was directed, from 2010 to late 2016, by **CÉSAR HORACIO DUARTE JÁQUEZ**, Carlos Gerardo Hermosillo Arteaga and Guadalupe Medina Aragón. He stated that they were the only ones who were able to interfere in the way in which the resources were handled and who were aware of the movements of money.

EX - DUARTE JAQUEZ - 001048

The witnesses identified as N52S1-6FDX37M/2017, 56RT65PW7, KA5P23/2019, 5M4GYUH19A/2019 were part of the public administration of Chihuahua when **CÉSAR HORACIO DUARTE JÁQUEZ** was Governor.

The witnesses agree that, during the exercise of their powers and actions, they were able to be informed directly of the existence and operation of a structure headed by the former governor that took public resources in the state for their own benefit. This organization was operated through an integral organization that was formed especially since 2012 and was formed by high-level public servants, such as the then-Secretary of the Internal Revenue Service and the Secretary of Rural Development, in addition to the following: Javier Garfio Pacheco, Pedro Hernández Flores, Marcelo González Tachiquín, Carlos Gerardo Hermosillo Arteaga, Gerardo Villegas Madriles, Sergio Medina, Antonio Tarín, Santiago Moreira, Everardo Medina, Manuel Bremer, Sergio Jurado, Ricardo Yáñez Herrera and Jesús Alonso Duarte García. Likewise, since 2012, some businessmen had a close relationship with the former governor, including José Yáñez, Jaime Galván, Parrish Cárdenas, Anuar Elías, Gabriel Aude, Eduardo González and Eugenio Baeza.

The criminal case contains an identification proceeding that took place on October 8, 2019 and was performed by the person whose identity is reserved under the individualization control number 56RT65PW7, where the witness recognized **CESAR HORACIO DUARTE JAQUEZ** as the person who appears in the photograph marked with number 5.

\* \* \*

In accordance with Articles 3 and 10, sections 2 and 3, subsections a) and b) of the Extradition Treaty between the United Mexican States and the United States of America, our government provides and attaches duly certified, legalized and sworn copies, along with English translations of the following:

## EXHIBITS

I.    Sworn statement by Daisy Alvarez Zavala, Executive Head Prosecutor attached to the Directorate of Extraditions at the General Directorate of International Procedures of the Deputy Attorney General's Office for Legal and International Affairs of the Federal Attorney General's Office, in which she states that she is familiar with the case being pursued against **CESAR HORACIO DUARTE JAQUEZ**. She also explains the charges filed against the accused and the laws applicable to the case, and also provides a summary of the facts and describes the evidence that proves his alleged responsibility in the perpetration of the crimes of which he is accused, and attaches:

**ANNEX A:** Sworn statement made by Cesar Augusto Peniche Espejel, Public Prosecutor in the State of Chihuahua, where he summarizes the investigation made by the law enforcement authorities in the State of Chihuahua, and explains the evidence collected to credit the alleged perpetration of **CÉSAR HORACIO DUARTE JÁQUEZ** of the crimes of which he is accused.

**EXHIBIT 1.** Arrest warrant dated October 8, 2019, issued against **CÉSAR HORACIO DUARTE JÁQUEZ** by the Control Judge for Pre-Trial Proceedings of the Judicial District of Morelos, State of Chihuahua, within criminal case number 3041/2019, for the crimes of

EX - DUARTE JAQUEZ - 001050

Embezzlement of Public Funds with aggravated penalty and Criminal Association with aggravated penalty to the detriment of the Government of the State of Chihuahua. In the same order, the judge also states that, pursuant to the statutes of limitations established by the laws in the State of Chihuahua, and considering what benefits the accused the most regarding the crime of embezzlement of public funds–given that the first event took place on June 17, 2011 and the last on November 28, 2014–the statute of limitations will expire at the end of June 16, 2027 and the end of November 27, 2030, respectively.

Also, regarding the crime of Criminal Association, given that the last event took place on November 28, 2014, the statute of limitations will expire on August 27, 2024.

**EXHIBIT 2.** Text containing the legal provisions that determined the elements constituting the crimes, the penalties applicable thereto and the provisions regarding the statute of limitations of the criminal case, valid at the time in which the events took place.

**EXHIBIT 3.** Criminal complaint filed on November 22, 2018 by Gregorio Daniel Morales Luévano and Karla Guadalupe Godoy Ortiz, public servants attached to the Secretariat of Public Service of the Government of the State of Chihuahua.

**EXHIBIT 4.** Decree number 1136/2010 XI P.E. from August 10, 2010, published in the Official Journal of the State of Chihuahua, which credits the appointment of **CÉSAR HORACIO DUARTE JÁQUEZ** as Governor of said entity. Attached to this decree are the pay slips that correspond to the years 2011, 2012, 2013, 2014, 2015 and 2016. These

slips show the monthly base salary for the State Governor.

**EXHIBIT 5.** Electronic commercial page 24139, which was registered on January 16, 2008 at the Public Registry of Commerce of the State of Chihuahua, for the incorporation of the corporation known as "Financiera de la División del Norte", S.A. de CV, SOFOM, ENR, where **CÉSAR HORACIO DUARTE JÁQUEZ** was a shareholder and president of the Administration Board. Also, attached is an M8 format for the alienation of shares, which was registered on November 12, 2008 for the purchase of shares in favor of Carlos Gerardo Hermosillo Arteaga. Also, there are M2 formats attached, which were registered on October 5, 2009, October 29, 2010 and February 28, 2012, for the increase in capital of the corporation called "Financiera de la División del Norte", S.A. de CV, SOFOM, ENR.

**EXHIBIT 6.** Resolution number 110.01.GC30/07 from May 24, 2007, issued by the Department of Agriculture and Livestock Organizations, of the Directorate of the National Agriculture and Livestock Registry of the Legal Coordination of the Secretariat of Agriculture, Ranching, Rural Development, Fishing and Food, for which a registry resolution was issued for the incorporation, organization and operation of Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua.

**EXHIBIT 7.** Grant Agreement number 352/2011, dated June 1, 2011, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del

Estado de Chihuahua, which was represented by Carlos Gerardo Hermosillo Arteaga, in his capacity as Interim President of the Board of Directors. This agreement has attached the check number 011876 dated June 16, 2011 for the amount of $582,965.80 Mexican pesos.

**EXHIBIT 8.** Agreement to Coordinate Actions, dated September 14, 2010, signed between the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, which was represented by Pedro Rubén Ferreiro Maíz, José Refugio Olivas Navarrete and Jorge Kosturakis García, through which the Government of the State of Chihuahua was required to make contributions derived from the Program Coordination Framework Agreement for the Acquisition of Meat-Producing Heifers in the State of Chihuahua, to which 2 receipts dated November 30, 2011 are attached, signed by Carlos Gerardo Hermosillo Arteaga, legal representative of "Financiera de la División del Norte", S.A. de CV, SOFOM, ENR, for the amounts of $9,210,000.00 and $2,790,000.00. It also has attached the Program Coordination Framework Agreement for the Acquisition of Meat-Producing Heifers in the State of Chihuahua from September 13, 2011, and its rules of operation.

**EXHIBIT 9.** Agreement to Coordinate Actions, dated September 14, 2011, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, represented by Pedro Roberto Baca

EX - DUARTE JAQUEZ - 001053

Gómez, through which the Government of the State of Chihuahua was required to make contributions derived from the Coordination Framework Agreement for the Acquisition of Meat-Producing Heifers in the State of Chihuahua on September 13, 2011.

**EXHIBIT 10.** Grant Agreement number 991/2011, dated December 1, 2011, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, which was represented by Carlos Gerardo Hermosillo Arteaga, through which the Government of the State of Chihuahua was required to give a grant to Unión Ganadera as an indemnity for producers to transport their non-productive livestock to the meat processing plant to be sacrificed, for the amount of $36,000,000.00 Mexican pesos.

**EXHIBIT 11.** Loan Contract with Interest number 887/2011, dated November 14, 2011, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, represented by Pedro Roberto Baca Gómez, through which the Government of the State of Chihuahua gives a loan to Unión Ganadera to be used exclusively for work capital, purchase of cattle for the production of meat, for the amount of $5,000,000.00. Unión Ganadera agrees in the contract to pay in one lump sum on June 30, 2013.

EX - DUARTE JAQUEZ - 001054

**EXHIBIT 12.** Grant Agreement number 305/2012, dated April 19, 2012, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, which was represented by Pedro Baca Gómez, through which the Government of the State of Chihuahua gives a grant to Unión Ganadera so that it may acquire 116 pieces of artificial insemination equipment for the amount of $2,692,288.00 Mexican pesos.

**EXHIBIT 13.** Grant Agreement number 376/2012, dated May 25, 2012, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, which was represented by Pedro Baca Gómez, through which the Government of the State of Chihuahua gave a grant to Unión Ganadera so that it could acquire food for cattle for the amount of $10,000,000.00 Mexican pesos.

**EXHIBIT 14.** Grant Agreement number 384/2013, dated March 26, 2013, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, represented by Pedro Baca Gómez, through which the Government of the State of Chihuahua gave Unión Ganadera a grant to defray expenses from the transport of exhibition cattle to the San Marcos Fair in the State of Aguascalientes, for the amount of $250,000.00 Mexican pesos.

EX - DUARTE JAQUEZ - 001055

**EXHIBIT 15.** Grant Agreement number 0426/2013, dated March 26, 2013, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, which was represented by Pedro Baca Gómez, through which the Government of the State of Chihuahua gives a grant to Unión Ganadera to complement the resources assigned to defray the expenses to transport the exhibition cattle to the San Marcos Fair in the State of Aguascalientes, for the amount of $60,000.00 Mexican pesos.

**EXHIBIT 16.** Grant Agreement number 0995/2013, dated October 20, 2013, signed by the Government of the State of Chihuahua through the Internal Revenue Service and the Secretariat of Rural Development, and the corporation called Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, which was represented by Pedro Baca Gómez, through which the Government of the State of Chihuahua gave a grant to Unión Ganadera so that it could execute the Meat-Producing Cattle Repopulation Program in the state, for the amount of $4,600,000.00 Mexican pesos.

**EXHIBIT 17.** Documents called INTERFAZ SIGOS–SFI SUBSIDIO, related to the grants with page numbers CP-S-27151/2014, CP-S-27152/2014 and CP-S-27153/2014, in favor of Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua, as support for the purchase of oatmeal, beans and corn for livestock producers in the aforementioned Unión Ganadera, for a total of $5,500,000.00 Mexican

EX - DUARTE JAQUEZ - 001056

pesos.

**EXHIBIT 18.** Administration and Investment Trust Contract dated June 11, 2013, signed by CÉSAR HORACIO DUARTE JÁQUEZ and Bertha Olga Gómez Fong, and the Fiduciary Institution "Banco Mercantil del Norte", S.A., Institución de Banca Múltiple, Grupo Financiero Banorte, in which the accused included as initial capital the amount of $65,000,000.00 Mexican pesos for the Fiduciary to receive and keep the initial capital and to invest and reinvest said amount.

**EXHIBIT 19.** Technical Financial-Accounting Report from May 9, 2019, signed by Yoshi Karina Fong Nájera, Director attached to the Secretariat of Public Service of the State of Chihuahua, which establishes the traceability of the public money granted during the tax years 2011 to 2014 by the Government of the State of Chihuahua to the corporations Unión Ganadera Regional General "División del Norte" del Estado de Chihuahua and Financiera de la División del Norte", S.A. de CV, SOFOM, ENR.

**Exhibit 20.** Identification Proceeding conducted on October 8, 2019 by the person whose identity is reserved under the individualization control number 56RT65PW7.

**Exhibit 21.** Photographs of **CÉSAR HORACIO DUARTE JÁQUEZ**.

In accordance with what is established on Article 10, number 2, section e) of the Extradition Treaty between the United Mexican States and the United States of America, the information that was obtained from the accused's general information:

## GENERAL INFORMATION

Name:                           **CÉSAR HORACIO DUARTE JÁQUEZ**.

Nationality:                    Mexican

Date of Birth:                  ███████ 1963.

Unique Population

Registration Number:            DUJC630414HCHRQS05

It is known that **CÉSAR HORACIO DUARTE JÁQUEZ** may be found in the United States of America.

In compliance with Article 19 of the Extradition Treaty signed between the United Mexican States and the United States of America, the Mexican Government requests the confiscation and surrender of all items, instruments, and objects of value, or any documents related to the crime, even if they were not used to carry out said crime, that were in the possession of the accused, **CÉSAR HORACIO DUARTE JÁQUEZ** at the time of his arrest, or at a later date, which could be used as evidence in the criminal case against him.

Based on the above, I am enclosing in a duly legalized package, along with translations into English, the documents that indicate, apart from the crime of which the accused is charged, the elements of said crime, the place, time and circumstances in which the crime was committed, and the information resulting from the criminal proceedings instituted by Mexican authorities to prove the crime and to determine the alleged culpability of **CÉSAR HORACIO DUARTE JÁQUEZ**. The package, which also includes the arrest warrant for this person, is submitted to Your Excellency as the true information that it is.

In light of the above, Mister Secretary, and since this petition satisfies the conditions described in the Extradition Treaty currently in force between our two countries and, to the best of my knowledge, also satisfies the internal procedures of the Mexican State as well as the procedures established by the Extradition Treaty to process this **FORMAL REQUEST FOR INTERNATIONAL EXTRADITION,** I hereby request Your Excellency's kind mediation so as to secure from the competent U.S. authorities, including the judicial ones, the extradition of **CÉSAR HORACIO DUARTE JÁQUEZ** from the United States to Mexico.

I thank you in advance for your valuable assistance concerning this matter. I avail myself of this opportunity to renew to you the assurances of my highest and most distinguished consideration.

Martha Elena Federica Bárcena Coqui
Ambassador

**TREATIES AND OTHER INTERNATIONAL ACTS SERIES 9656**

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and MEXICO

Signed at Mexico City May 4, 1978



EX - DUARTE JAQUEZ - 001060

## NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89–497, approved July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

". . . the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence . . . of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, as the case may be, therein contained, in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentication thereof."

*For sale by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402. Subscription Price: $110; $27.50 additional for foreign mailing. Single copies vary in price. This issue $2.*

EX - DUARTE JAQUEZ - 001061

# MEXICO

## Extradition

*Treaty signed at Mexico City May 4, 1978;*
*Ratification advised by the Senate of the United States of America*
*November 30, 1979;*
*Ratified by the President of the United States of America Decem-*
*ber 13, 1979;*
*Ratified by Mexico January 31, 1979;*
*Ratifications exchanged at Washington January 25, 1980;*
*Proclaimed by the President of the United States of America*
*February 6, 1980;*
*Entered into force January 25, 1980.*

---

By the President of the United States of America

## A PROCLAMATION

Considering that:

The Extradition Treaty between the United States of America and the United Mexican States was signed at Mexico City on May 4, 1978, the text of which, in the English and Spanish languages, is hereto annexed;

The Senate of the United States of America by its resolution of November 30, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 13, 1979, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of the United Mexican States;

It is provided in Article 23 of the Treaty that the Treaty shall enter into force on the date of exchange of the instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on January 25, 1980; and accordingly the Treaty entered into force on that date;

Now, therefore, I, Jimmy Carter, President of the United States of America, proclaim and make public the Treaty, to the end that it be observed and fulfilled with good faith on and after January 25,

EX - DUARTE JAQUEZ - 001062

2

1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of February in the year of our Lord one thousand nine hundred eighty and [SEAL] of the Independence of the United States of America the two hundred fourth.

JIMMY CARTER

By the President:
CYRUS VANCE
*Secretary of State*

TIAS 9656

EX - DUARTE JAQUEZ - 001063

3

EXTRADITION TREATY BETWEEN
THE UNITED STATES OF AMERICA AND
THE UNITED MEXICAN STATES

The Government of the United States of America and the Government of the United Mexican States;

Desiring to cooperate more closely in the fight against crime and, to this end, to mutually render better assistance in matters of extradition;

Have agreed as follows:

## ARTICLE 1

### Obligation to Extradite

1.- The Contracting Parties agree to mutually extradite, subject to the provisions of this Treaty, persons who the competent authorities of the requesting Party have charged with an offense or have found guilty of committing an offense, or are wanted by said authorities to complete a judicially pronounced penalty of deprivation of liberty for an offense committed within the territory of the requesting Party.

2.- For an offense committed outside the territory of the requesting Party, the requested Party shall grant extradition if:

    a) its laws would provide for the punishment of such an offense committed in similar circumstances, or

TIAS 9656

EX - DUARTE JAQUEZ - 001064

4

b)   the person sought is a national of the requesting Party, and that Party has jurisdiction under its own laws to try that person.

## ARTICLE 2

### Extraditable Offenses

1.- Extradition shall take place, subject to this Treaty, for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year.

2.- If extradition is requested for the execution of a sentence, there shall be the additional requirement that the part of the sentence remaining to be served shall not be less than six months.

3.- Extradition shall also be granted for wilful acts which, although not being included in the Appendix, are punishable, in accordance with the federal laws of both Contracting Parties, by a deprivation of liberty the maximum of which shall not be less than one year.

4.- Subject to the conditions established in paragraphs 1, 2 and 3, extradition shall also be granted:

a)   For the attempt to commit an offense; conspiracy to commit an offense; or the participation in the execution of an offense; or

b)   When, for the purpose of granting jurisdiction to the Unit

**TIAS 9656**

EX - DUARTE JAQUEZ - 001065

5

ed States government, transportation of persons or property, the use of the mail or other means of carrying out interstate or foreign commerce, is also an element of the offense.

## ARTICLE 3

### Evidence Required

Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or to prove that he is the person convicted by the courts of the requesting Party.

## ARTICLE 4

### Territorial Application

1.- For the purposes of this Treaty, the territory of a Contracting Party shall include all the territory under the jurisdiction of that Contracting Party, including airspace and territorial waters and vessels and aircraft registered in that Contracting Party if any such aircraft is in flight when the offense is committed.

2.- For the purposes of this Treaty, an aircraft shall be considered to be in flight at any time from the moment when all its external doors are closed following the embarkation until the moment when any such door is opened for disembarkation.

## ARTICLE 5

### Politicial and Military Offenses

1.- Extradition shall not be granted when the offense for which

**TIAS 9656**

EX - DUARTE JAQUEZ - 001066

6

it is requested is political or of a political character.

If any question arises as to the application of the foregoing para
graph, the Executive authority of the requested Party shall decide.

2.- For the purpose of this Treaty, the following offenses shall
not be considered to be offenses included in paragraph 1:

    a) The murder or other wilful crime against the life or
       physical integrity of a Head of State or Head of Govern
       ment or of his family, including attempts to commit
       such an offense.

    b) An offense which the Contracting Parties may have the
       obligation to prosecute by reason of a multilateral inter
       national agreement.

3.- Extradition shall not be granted when the offense for which
extradition is requested is a purely military offense.

## ARTICLE 6
### Non bis in idem

Extradition shall not be granted when the person sought has been
prosecuted or has been tried and convicted or acquitted by the requested
Party for the offense for which extradition is requested.

## ARTICLE 7
### Lapse of Time

Extradition shall not be granted when the prosecution or the en-

TIAS 9656

7

forcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party.

### ARTICLE 8
#### Capital Punishment

When the offense for which extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party furnishes such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

### ARTICLE 9
#### Extradition of Nationals

1.- Neither Contracting Party shall be bound to deliver up its own nationals, but the executive authority of the requested Party shall, if not prevented by the laws of that Party, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

2.- If extradition is not granted pursuant to paragraph 1 of this Article, the requested Party shall submit the case to its competent authorities for the purpose of prosecution, provided that Party has jurisdiction over the offense.

TIAS 9656

EX - DUARTE JAQUEZ - 001068

8

## ARTICLE 10

### Extradition Procedures and Required Documents

1.- The request for extradition shall be made through the diplomatic channel.

2.- The request for extradition shall contain the description of the offense for which extradition is requested and shall be accompanied by:

    a)  A statement of the facts of the case;

    b)  The text of the legal provisions describing the essential elements of the offense;

    c)  The text of the legal provisions describing the punishment for the offense;

    d)  The text of the legal provisions relating to the time limit on the prosecution or the execution of the punishment of the offense;

    e)  The facts and personal information of the person sought which will permit his identification and, where possible, information concerning his location.

3.- In addition, when the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by:

    a)  A certified copy of the warrant of arrest issued by a judge or other judicial officer of the requesting Party;

TIAS 9656

EX - DUARTE JAQUEZ - 001069

9

b)   Evidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there.

4.- When the request for extradition relates to a convicted person, it shall be accompanied by a certified copy of the judgment of conviction imposed by a court of the requesting Party.

If the person was found guilty but not sentenced, the extradition request shall be accompanied by a certification to that effect and a certified copy of the warrant of arrest.

If such person has already been sentenced, the request for extradition shall be accompanied by a certification of the sentence imposed and a statement indicating which part of the sentence has not been carried out.

5.- All the documents that must be presented by the requesting Party in accordance with the provisions of this Treaty shall be accompanied by a translation in the language of the requested Party.

6.- The documents which, according to this Article, shall accompany the request for extradition, shall be received in evidence when:

a)   In the case of a request emanating from the United States, they are authenticated by the official seal of the Department of State and legalized by the manner prescribed by the Mexican law;

**TIAS 9656**

EX - DUARTE JAQUEZ - 001070

10

b) In the case of a request emanating from the United Mexican States, they are certified by the principle diplomatic or consular officer of the United States in Mexico.

## ARTICLE 11

### Provisional Arrest

1.- In the case of urgency, either Contracting Party may request, through the diplomatic channel, the provisional arrest of an accused or convicted person. The application shall contain a description of the offense for which the extradition is requested, a description of the person sought and his whereabouts, an undertaking to formalize the request for extradition, and a declaration of the existence of a warrant of arrest issued by a competent judicial authority or a judgment of conviction issued against the person sought.

2.- On receipt of such a request, the requested Party shall take the necessary steps to secure the arrest of the person claimed.

3.- Provisional arrest shall be terminated if, within a period of 60 days after the apprehension of the person claimed, the executive authority of the requested Party has not received the formal request for extradition and the documents mentioned in Article 10.

4.- The fact that the provisional arrest is terminated pursuant to paragraph 3 shall not prejudice the extradition of the person sought if the request for extradition and the necessary documents mentioned in Article 10 are delivered at a later date.

TIAS 9656

EX - DUARTE JAQUEZ - 001071

11

## ARTICLE 12

### Additional Evidence

If the Executive authority of the requested Party considers that the evidence furnished in support of the request for extradition is not sufficient in order to fulfill the requirements of this Treaty, that Party shall request the presentation of the necessary additional evidence.

## ARTICLE 13

### Procedure

1.- The request for extradition shall be processed in accordance with the legislation of the requested Party.

2.- The requested Party shall make all arrangements necessary for internal procedures arising out of the request for extradition.

3.- The competent legal authorities of the requested Party shall be authorized to employ all legal means within their power to obtain from the judicial authorities the decisions necessary for the resolution of the request for extradition.

## ARTICLE 14

### Decision and Surrender

1.- The requested Party shall promptly communicate to the requesting Party its decision on the request for extradition.

2.- In the case of complete or partial rejection of a request for extradition, the requested Party shall give the reasons on which it was based.

TIAS 9656

EX - DUARTE JAQUEZ - 001072

12

3.- If the extradition is granted, the surrender of the person sought shall take place within such time as may be prescribed by the laws of the requested Party. The competent authorities of the Contracting Parties shall agree on the date and place of the surrender of the person sought.

4.- If the competent authority has issued the warrant or order for the extradition of the person sought and he is not removed from the territory of the requested Party within the prescribed period, he shall be set at liberty and the requested Party may subsequently refuse to extradite him for the same offense.

ARTICLE 15

Delayed Surrender

The requested Party, after granting the extradition, may defer the surrender of the person sought when that person is being proceeded against or is serving a sentence in the territory of the requested Party for a different offense, until the conclusion of the proceeding or the full execution of the punishment that has been imposed.

ARTICLE 16

Requests for extradition made by Third States

The requested Party, in the case of receiving requests from the other Contracting Party and from one or more third States for the extradition of the same person, be it for the same offense or for different offenses, shall decide to which requesting State it shall grant the ex

EX - DUARTE JAQUEZ - 001073

13

tradition of that person.

## ARTICLE 17

### Rule of Speciality

1.- A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted nor be extradited by that Party to a third State unless:

    a)  He has left the territory of the requesting Party after his extradition and has voluntarily returned to it;

    b)  He has not left the territory of the requesting Party within 60 days after being free to do so; or

    c)  The requested Party has given its consent to his detention, trial, punishment or extradition to a third State for an offense other than that for which the extradition was granted.

These stipulations shall not apply to offenses committed after the extradition.

2.- If, in the course of the procedure, the classification of the offense is changed for which the person requested was extradited, he shall be tried and sentenced on the condition that the offense, in its new legal form:

    a)  Is based on the same group of facts established in the request for extradition and in the documents presented in its support; and

**TIAS 9656**

EX - DUARTE JAQUEZ - 001074

14

b)   Is punishable with the same maximum sentence as the crime for which he was extradited or with a lesser sentence.

## ARTICLE 18

### Summary Extradition

If the person sought informs the competent authorities of the requested Party that he agrees to be extradited, that Party may grant his extradition without further proceedings, and shall take all measures permitted under its laws to expedite the extradition. In such cases Article 17 shall not be applicable.

## ARTICLE 19

### Surrender of Property

1.- To the extent permitted under the law of the requested Party and subject to the rights of third parties, which shall be duly respected, all articles, instruments, objects of value or documents relating to the offense, whether or not used for its execution, or which in any other manner may be material evidence for the prosecution, shall be surrendered upon the granting of the extradition even when extradition cannot be effected due to the death, disappearance, or escape of the accused.

2.- The requested Party may condition the surrender of articles upon a satisfactory assurance from the requesting Party that the articles will be returned to the requested Party as soon as possible.

TIAS 9656

EX - DUARTE JAQUEZ - 001075

15

## ARTICLE 20

### Transit

1.- The right to transport through the territory of one of the Contracting Parties a person who is not a national of that Contracting Party surrendered to the other Contracting Party by a third State shall be granted on presentation made through the diplomatic channel of a certified copy of the decision on extradition, provided that reasons of public order are not opposed to the transit.

2.- The authorities of the transit State shall be in charge of the custody of the extradited person while that person is in its territory.

3.- The Party to which the person has been extradited shall reimburse the State through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

## ARTICLE 21

### Expenses

The requested Party shall bear the expenses of the arrangements referred to in Article 13, with the exception that the expenses incurred for the translation of documents and, if applicable, for the transportation of the person ordered extradited shall be paid by the requesting Party.

## ARTICLE 22

### Scope of Application

1.- This Treaty shall apply to offenses specified in Article 2 com

TIAS 9656

65-773 O - 80 - 3 : QL 3

EX - DUARTE JAQUEZ - 001076

16

mitted before and after this Treaty enters into force.

2.- Requests for extradition that are under process on the date of the entry into force of this Treaty, shall be resolved in accordance with the provisions of the Treaty of 22 February, 1899,[1] and the Additional Conventions on Extradition of 25 June 1902,[2] 23 December 1925,[3] and 16 August 1939.[4]

## ARTICLE 23

### Ratification, Entry into Force, Denunciation

1.- This Treaty shall be subject to ratification; the exchange of instruments of ratification shall take place in Washington as soon as possible.

2.- This Treaty shall enter into force on the date of exchange of the instruments of ratification.

3.- On entry into force of this Treaty, the Treaty of Extradition of 22 February 1899 and the Additional Conventions on Extradition of 25 June 1902, 23 December 1925 and 16 August 1939 between the United States of America and the United Mexican States, shall cease to have effect without prejudice to the provisions of Article 22.

4.- Either Contracting Party may terminate this Treaty by giving notice to the other Party. The termination shall take effect six months after the receipt of such notice.

---

[1] TS 242 ; 31 Stat. 1818.
[2] TS 421 ; 9 Bevans 918.
[3] TS 741 ; 44 Stat. 2409.
[4] TS 967 ; 55 Stat. 1133.

TIAS 9656

17

Done in two originals, in the English and Spanish languages, both equally authentic, at Mexico City this fourth day of May, one thousand nine hundred seventy-eight.

[1]

For the Government of the
United States of America

[2]

For the Government of the
United Mexican States

---

[a] Cyrus Vance.
[2] S. Roel.

TIAS 9656

EX - DUARTE JAQUEZ - 001078

18

APPENDIX

1. Murder or manslaughter; abortion.

2. Malicious wounding or injury.

3. Abandonment of minors or other dependents when there is danger of injury or death.

4. Kidnapping; child stealing; abduction; false imprisonment.

5. Rape; statutory rape; indecent assault; corruption of minors, including unlawful sexual acts with or upon children under the age of consent.

6. Procuration; promoting or facilitating prostitution.

7. Robbery; burglary; larceny.

8. Fraud.

9. Embezzlement.

10. An offense against the laws relating to counterfeiting and forgery.

11. Extortion.

12. Receiving or transporting any money, valuable securities, or other property knowing the same to have been unlawfully obtained.

13. Arson; malicious injury to property.

14. Offenses against the laws relating to the traffic in, possession, production, manufacture, importation or exportation of dangerous drugs and chemicals, including narcotic drugs, cannabis, psychotropic drugs, opium, cocaine, or their derivatives.

15. Offenses against the laws relating to the control of poisonous chemicals or substances injurious to health.

TIAS 9656

EX - DUARTE JAQUEZ - 001079

19

16. Piracy.

17. Offenses against the safety of means of transportation including any act that would endanger a person in a means of transportation.

18. An offense relating to unlawful seizure or exercise of control of trains, aircraft, vessels, or other means of transportation.

19. Offenses against the laws relating to prohibited weapons, and the control of firearms, ammunition, explosives, incendiary devices or nuclear materials.

20. An offense against the laws relating to international trade and transfers of funds or valuable metals.

21. An offense against the laws relating to the importation, exportation, or international transit of goods, articles, or merchandise, including historical or archeological items.

22. Violations of the customs laws.

23. Offenses against the laws relating to the control of companies, banking institutions, or other corporations.

24. Offenses against the laws relating to the sale of securities, including stocks, bonds and instruments of credit.

25. Offenses against the laws relating to bankruptcy or rehabilitation of a corporation.

26. Offenses against the laws relating to prohibition of monopoly or unfair transactions.

27. Offenses against the laws relating to protection of industrial property or copyright.

28. Offenses against the laws relating to abuse of official authority.

TIAS 9656

20

29. Bribery, including soliciting, offering and accepting bribes.

30. Perjury; false statments to any governmental authority. Sub-ornation of perjury or false statements.

31. Offenses against the laws relating to obstruction of justice, including harboring criminals and suppressing evidence.

TIAS 9656

EX - DUARTE JAQUEZ - 001081