**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-22829-MC-LFL**

IN THE MATTER OF
THE EXTRADITION OF
CESAR HORACIO DUARTE JAQUEZ
_____/

**MEMORANDUM OF EXTRADITION LAW**
**AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in executing its treaty responsibilities and acting at the request of the Government of the United Mexican States ("Mexico"), urges that the fugitive, Cesar Horacio Duarte Jaquez ("Duarte" or "the fugitive"), be held without bond pending the hearing on the certification of the extradition pursuant to 18 U.S.C. §§ 3184 *et seq.* This memorandum summarizes the framework of U.S. extradition law and sets forth the reasons why this Court should order Duarte's detention. In short, Duarte cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight or danger to the community and that special circumstances exist warranting his release.

**BACKGROUND**

The Government of Mexico seeks Duarte's extradition to try him on charges of aggravated embezzlement, in violation of the first paragraph, section I, and second paragraph of Article 270 of the Criminal Code for the State of Chihuahua; and aggravated conspiracy, in violation of Articles 246 and 248 of the same code. Duarte allegedly committed these offenses within the jurisdiction of Mexico. A Constitutional Rights Court Judge for the Judicial District of Morelos, in Chihuahua, Chihuahua, Mexico, Maria Alejandra Ramos Duran, issued a warrant for Duarte's

arrest on October 8, 2019.  Req. at 115-202.[1]  The warrant and supporting documents included in the extradition request lay out the following facts:

Duarte served as the Governor of the State of Chihuahua, Mexico from October 2010 to October 2016.  Req. at 49, 119.  The law obligated Duarte, as Governor, to administer state funds efficiently and impartially.  Req. at 49-51.  However, after he left office, Mexican authorities discovered that Duarte, with the assistance of officials in his administration and others, had misappropriated state funds for the benefit of himself and his associates.  Req. at 51, 118-20, 191.

In particular, Mexican authorities uncovered significant irregularities in state subsidy and loan programs purportedly intended to support the state's cattle producers and in an alleged real estate purchase for the state.  Req. at 52-55, 119.  From at least June 2011 to November 2014, the State of Chihuahua transferred over $96,000,000 Mexican pesos to two companies, Union Ganadera Regional General Division del Norte del Estado de Chihuahua ("Union Ganadera") and Financiera de la Division del Norte ("Financiera").[2]  Req. at 52 (chart of improper payments), 118-19.  Duarte was the majority shareholder of Financiera, a shareholder of Union Ganadera, and, at points, the chairman of the board of directors of both companies.  Req. at 49, 120.  Numerous witnesses, including high-level former officials from Duarte's administration, admitted that the payments were fraudulent, illegal, and made under false pretenses; that the process allocating those

---

[1] Mexico's extradition request is referred to herein as "Req." with citations to the Bates-labeled page numbers appearing at the bottom right of each page.  A copy of the English-translated request appears as Exhibits 4 to 7 to Docket Entry No. 1.

[2] The remainder of the monetary amounts described in this memorandum are in Mexican pesos unless otherwise noted.

payments was irregular; and that the money was not used for any public purpose.  Req. at 62-66, 120-28.

Duarte perpetrated this scheme with several associates within and outside of his government, including Carlos Gerardo Hermosillo Arteaga ("Hermosillo").  Req. at 1017-18. Hermosillo and other top-level public officials in the Duarte administration, including the Secretary of the Treasury, the General Director of Public Investment Programs, the Secretary of Rural Development, the Director of Agricultural Development, and the Secretary of Rural Planning, authorized the unlawful payments to Duarte's businesses.  Req. at 50, 56-57, 61-62.

These officials approved the payment of funds without following procedures required by Mexican law, without complete or proper documentation, without sufficient budgetary justification, and without requisite follow-up to ensure that the funds were used for the stipulated purpose.  Req. at 120-28, 1020-21.  In some cases, funds were improperly withdrawn from the *cuenta deudora*, the state's emergency fund.  *E.g.*, Req. at 39, 82, 90, 97, 177, 1044.  The *cuenta deudora* was intended to be used only in the event of serious state emergencies that required immediate expenditures without supporting documentation, such as climate events or natural disasters.  Req. at 39, 1044.  According to Mexican authorities, money transferred from the state treasury to Union Ganadera and Financiera was not used as earmarked.  *E.g.*, Req. at 69, 72, 76, 80, 92, 98, 101, 1044.  Instead, according to a forensic finance expert, that money ended up in bank or trust accounts, property, and companies that primarily benefited Duarte, his family members, and his associates.  Req. at 191, 1046.

The extradition request summarizes eleven improper transactions.  *See* Req. at 67-111, 129-88.  To give one example, the State of Chihuahua, acting through officials in Duarte's

administration, entered into an agreement with Union Ganadera, which purportedly paid cattle ranchers to transport unproductive livestock for slaughter. Req. at 81, 153. Those officials later admitted that they understood that this agreement was not legal and irregular. *E.g.*, Req. at 82 (testimony of protected witness, the former General Director of Investment Programs, that "this process for economic support was not legal"), 152-54. Pursuant to that agreement, the State of Chihuahua paid Union Ganadera $36 million between January and March 2012 using funds drawn from the *cuenta deudora*, the state's emergency fund. Req. at 84, 158. Of the listed beneficiaries, forty-five were dead, and another six stated that they never signed the documents that bore their signatures or received any funds under the program. Req. at 83. Forensic analysis traced those funds through Union Ganadera and uncovered $7.2 million that went to purchase ranch properties for Duarte, approximately $3.4 million for the private purchase of Angus bulls for Duarte, $250,000 to a construction company owned by Duarte's wife, and $6 million that ended up in a trust account established by Duarte and his wife. Req. at 84-89, 159.

The other transactions followed similar patterns and consisted of:

- A $582,965.80 payment to Union Ganadera, the bulk of which went to Duarte's wife's construction company and from there toward a payment on her American Express card, Req. at 67-70, 129-33;

- Two $12 million payments to Financiera, $10 million of which went to the Duarte trust fund, Req. at 70-77, 133-46;

- A $5 million "loan" to Union Ganadera, $3 million of which went to another Duarte family company for the purchase of a ranch, and which Duarte never repaid, Req. at 77-81, 146-52;

4

- An approximately $2.7 million payment to Union Ganadera for purchasing 116 pieces of livestock equipment, with no documentation attesting to such purchases being made, Req. at 90-93, 160-63;

- A $10 million payment to Union Ganadera to subsidize cattle feed, which a former government official described as a "false pretense," Req. at 94; *see also* Req. at 93-96, 163-68;

- An $8 million transfer to Financiera, one of many transactions involving the state's emergency fund, which for the most part ended up in the Duarte family trust, Req. at 96-99 , 168-71;

- Two payments to Union Ganadera totaling $310,000, some of which paid off another American Express bill, Req. at 99-102, 172-76;

- $4.6 million in funds provided to Union Ganadera, purportedly for the state's Meat-Producing Cattle Repopulation Program, Req. at 102-05, 176-82; and

- A $5.5 million transfer to Union Ganadera, supposedly to buy oatmeal, beans, and corn for livestock producers, the majority of which was expended paying Duarte's taxes for the year 2014, Req. at 106-11, 182-188.

After being defeated in the June 2016 gubernatorial election, Duarte told the Secretary of the Treasury that he was concerned about the irregular use of public funds during his administration, and said that he wanted to make the relevant transactions appear legal so that the incoming administration would not uncover his actions.  Req. at 66, 122.  Duarte met with the Secretary of the Treasury and other public officials and instructed them to take all actions necessary to conceal irregularities in the release of public funds during his administration.  Req. at

66, 122.  Subsequently, the Secretary of the Treasury held weekly meetings to coordinate the retroactive justification for any use of public funds lacking proper or complete documentation. Req. at 66, 122.

The Government of Mexico has requested that the United States extradite Duarte pursuant to its extradition treaty with the United States, the Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, *as amended by* the Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, U.S.–Mex., Nov. 13, 1997, S. Treaty Doc. No. 105–46 (1998) (collectively referenced hereafter as the "Treaty"). The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District on July 10, 2020.  Duarte is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I.    LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.    The limited role of the Court in extradition proceedings

The extradition process is *sui generis*.  Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge."  18 U.S.C. § 3184; *see also, e.g.*, *Kastnerova v. United States*, 365 F.3d 980, 984 n.5, 986 (11th Cir. 2004).  The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir. 1993).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal

issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (analogizing extradition hearing to a preliminary hearing in a criminal case); *Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *Martin*, 993 F.2d at 828.

### B.      The requirements for certification

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See, e.g.*, *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL

3776953, at *10 (S.D. Fla. Aug. 31, 2017); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015).  The following sections briefly discuss each of those requirements.

1.      Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority."  *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted).  Both magistrate judges and district judges may render a certification under Section 3184.  *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). This District's local rules also expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184."  *See* Rule 1(a)(3), Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida.

2.      Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Duarte, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3. Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.* The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Mexico. The Court must defer to the Department of State's determination in that regard. *See, e.g.*, *Arias v. Warden*, 928 F.3d 1281, 1288 (11th Cir. 2019) ("courts *must* defer to the determination of the executive branch in deciding whether an extradition treaty remains in force") (emphasis in original, internal quotation marks and citation omitted); *In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *11 (noting that "every Circuit Court, including our own, has deferred to the executive branch" on this question) (citing *Kastnerova*, 365 F.3d at 986).

### 4. Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article I of the applicable treaty in this case provides for the return of fugitives charged with, or convicted of, an "extraditable offense" as that term is defined within the treaty itself. Article II of the Treaty defines offenses as extraditable if they are "willful acts" that are either (1) listed in the Treaty's Appendix and punishable under the laws of both the United States and Mexico by a deprivation of liberty for a maximum term of not less than one year, or (2) though not listed on the Appendix, punishable under the federal laws of both the United States and Mexico by a deprivation of liberty for a maximum term of not less than one

year.  Item 9 of the Appendix lists "embezzlement," and Article 2(4)(a) of the Treaty specifically provides for the extraditability of "conspiracy to commit an offense."

In assessing whether the crimes for which extradition is requested meet the dual criminality requirement set forth in Article II, the Court should examine the description of criminal conduct provided by Government of Mexico in support of its charges and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Arias*, 928 F.3d at 1292-93 (noting that "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *United States v. Cardoso*, No. 04-mc-128, 2005 WL 1228826, at *3 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citing *Wright v. Henkel*, 190 U.S. 40, 61 (1903)).  A requesting country need not establish that its crimes are identical to ours.  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions."  *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country.  *Factor v. Laubenheimer*, 290 U.S. 276, 299-300 (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition").

Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

5.   <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by the Government of Mexico were committed by the person before the Court. *Avila-Ramos v. Kammerzell*, 893 F.3d 1243, 1247 (10th Cir. 2018); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn*, 783 F.2d at 791 (internal quotation marks omitted); *Martinelli*, 2017 WL 3776953, at *21 (same).

**C.**    **An extradition hearing follows unique procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of the charges for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *see also, e.g.*, *Arias*, 928 F.3d at 1286 ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the

11

guilt or innocence of the accused.") (internal quotation marks and citation omitted).  An extradition hearing is not a criminal proceeding.  *See, e.g.*, *Martin*, 993 F.2d at 828.  Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017); and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

Accordingly, the Federal Rules of Criminal Procedure do not apply to extradition proceedings.  *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive.").  Moreover, many constitutional protections applicable in criminal cases do not apply to extradition hearings; for example, the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

Nor do the Federal Rules of Evidence apply to extradition proceedings.  *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").  Hearsay evidence is admissible at an extradition hearing and "[a] certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government."  *Shaw*, 2015 WL 3442022, at *4; *see also, e.g.*, *Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317).  Nothing more is required, and typically nothing

12

more is provided.  *See, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request."); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) (police detective's statement summarizing results of investigation established probable cause); *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive has no right to discovery, *see, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005), and his right to challenge the evidence against him at an extradition hearing is severely constrained, *see, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d at 1281.  A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913).  A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8.

Courts routinely reject technical and affirmative defenses in extradition proceedings.  *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as

insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (collecting cases). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D.     Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the court. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the Department of State." (citation omitted)). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *In re Kaine*, 55 U.S. 103, 110 (1852).

## II.     THE FUGITIVE SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[3] *See, e.g.*, *In re Extradition of Shaw*, No. 14–mc–81475, 2015 WL 521183,

---

[3] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Duarte is not charged with an "offense"

14

at *4-5 (S.D. Fla. Feb. 6, 2015).  Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

    **A.**    **Applicable law**

        1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is a presumption against bond."  *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process.").  The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling.  When, as here, a requesting country meets the conditions of the Treaty,

---

within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Mexico.

the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

   2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

  In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Shaw*, 2015 WL 521183, at *5; *Martinelli Berrocal*, 263 F. Supp. 3d at 1292 (for over a hundred years, the "special circumstances" test has been applied by circuit and district courts for bail determinations in extradition cases).[4] "This 'special

---

[4] "[T]here is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy . . . . [Some] courts require the person subject to international extradition to overcome the presumption against bail by presenting clear and convincing evidence that bail is warranted. . . . [and t]here is a negligible minority of courts that have adopted a preponderance of the evidence standard." *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 474-75 (S.D. Tex. 2010).

circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In the Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk). Crucially, the special circumstances inquiry is separate from, and additional to, considerations of the fugitive's flight risk and danger to the community. *See, e.g.*, *Martin*, 993 F.2d at 828 ("[The fugitive] complains only that the district court erred in determining that he was a flight risk. Absent proof of special circumstances, however, Martin is not entitled to bail."); *Salerno v. United States*, 878 F.2d 317, 317-18 (9th Cir. 1989) (low flight risk alone "is not the criteria for release in an extradition case"); *Leitner*, 784 F.2d at 161 ("[e]ven a low risk of flight" is not a circumstance sufficiently "unique" to "be dispositive"). Accordingly, a fugitive who fails to establish special circumstances should be detained even if he is deemed not to be a flight risk or danger to the community.

"[C]ourts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees." *Shaw*, 2015 WL 521183, at *5 (citation and quotation marks omitted). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with counsel, *see, e.g.*, *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992);

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1305; *In re Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fugitive's advanced age, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02, 1305 (66-year-old defendant); *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *2-4 (S.D. Fla. Nov. 16, 2009) (detaining 71-year-old fugitive despite his claims of "advanced age" and poor health);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61;

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *Noeller*, 2017 WL 6462358, at *8-9; *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Shaw*, 2015 WL 521183, at *8;

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *In re Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1070 (C.D. Cal. 2017); and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070-71.

While in certain exceptional cases some of the above may have been deemed a special

circumstance, courts generally determine special circumstances to exist based on a confluence of

18

factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B.     Analysis

The Court should detain Duarte without bond. Duarte is a significant flight risk and a potential danger to the witnesses against him and to the community for several reasons.

*First*, he has a strong incentive to flee. The two charges at issue in this extradition, aggravated embezzlement and aggravated conspiracy, carry penalties of up to twelve years' imprisonment and nine years' imprisonment, respectively. Req. at 213-15. The substantial amount of time he faces if convicted increases his risk of flight. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1305; *Shaw*, No. 2015 WL 521183, at *9 (noting that "the [fugitive] is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee"); *cf., e.g.*, *United States v. Londono-Villa*, 898 F.2d 328, 329 (2d Cir. 1990) (flight risk based in part on potential sentence of approximately twenty-four to thirty years of imprisonment); *United States v. Castiello*, 878 F.2d 554, 556 (1st Cir. 1989) (flight risk based in part on potential sentence of approximately eight to ten years of imprisonment); *United States v. Rankin*, 289 F. Supp. 3d 846, 849 (S.D. Ohio 2017) ("The length of a potential sentence bears on a defendant's risk of flight.").

*Second*, Duarte has the financial means to flee. As described above, he is alleged to have embezzled nearly $100 million Mexico pesos. While not all of that money went directly into his own pocket, it was used for his benefit or the benefit of those associated with him. Moreover, at least $30 million Mexican pesos (over US $1.2 million) of the money was deposited into a personal trust for him and his wife. Req. at 73, 99. Duarte has also owned multiple properties in Mexico,

including at least a home and three ranches, Req. at 85, 87, and has been a shareholder in a number of companies, including Union Ganadera, Financiera, Grupo Inmobiliario del Norte, S.A. de C.V., and Ganadera El Saucito Balleza, S.P.R. de R.L. de C.V.  Such wealth increases his risk of flight.  *See Martinelli Berrocal*, 263 F. Supp. 3d at 1304 (explaining that President Martinelli's "extreme[] wealth[]" outweighed his offer of an "extraordinary bond package" because he "could easily use his accumulated wealth to sustain himself and his family . . . after fleeing to another country," and that noting that "courts presented with similar evidence have continuously held that defendants with financial means to flee pose a serious risk of flight").

In addition, the request concerns only one of numerous pending criminal prosecutions against Duarte alleging embezzlement.  Req. at 200-21.  Thus, the $96 million described in this extradition request (worth approximately $6.5 million U.S. dollars in 2014) represents only a portion of the public money that Duarte allegedly stole during his tenure as governor.  Even if he retained the ability to access only a small fraction of those funds, such wealth would facilitate an easy escape to a third country.

*Third*, Duarte has a history of allegedly engaging in criminal misconduct and failing to abide by court orders.  Not only did the embezzlement scheme of which he is accused in this case last for over three years and involve numerous transactions, but he is also subject to other pending criminal cases in Mexico.  Moreover, Duarte was summoned to appear in court in Mexico on December 12 and 14, 2016, but refused to comply with the summons and instead sent a statement to the court claiming that he was receiving medical attention in the United States and indicating that he would not appear.  Req. at 201.  He also refused to comply with another summons to appear on June 23, 2017.  Req. at 201.  Thus, despite being well-aware of the charges pending against

him in Mexico, he has deliberately chosen to stay in the United States rather than return to Mexico to face the charges.  This track record is indicative of Duarte's risk of flight in the United States and suggests that he is not likely to abide by any conditions this Court might impose were it to release him.  *Cf., e.g.*, *United States v. Nicolo*, 706 F. Supp. 2d 330, 334 (W.D.N.Y. 2010) (denying U.S. defendant's motion for release pending appeal in part because his tax-fraud scheme had last over at least a seven-year period); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)); *Beresford-Redman*, 753 F. Supp. 2d at 1091 (fugitive found to be a flight risk because, among other things, he could have "return[ed] to Mexico and voluntarily surrender[ed], [but] he has not done so.").

Given his prior history of relocating from Mexico and failing to appear for his criminal proceedings there, further flight from the United States to yet another country or to an underground location in the United States is a reasonable assumption.  Allowance of bail in any amount would not guarantee Duarte's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.  The United States' ability to extradite fugitives from other countries could be severely compromised were the United States to release Duarte on bond and then have him flee the jurisdiction.

*Fourth*, separate and apart from his risk of flight, two potential witnesses in Duarte's pending prosecutions have provided declarations to Mexican authorities describing Duarte's

efforts to tamper with their testimony and to threaten or intimidate them into supporting his defense.  *See* Declaration of Protected Witness 56RT65PW7_T (attached hereto as Exhibit 1); Declaration of J.M.L.H. (attached hereto as Exhibit 2).

According to Witness 56RT65PW7_T, he is "afraid . . . because [he has] been the victim of threats against [his] person, issued by the former governor himself, Cesar Horacio Duarte Jaquez, and also by people who have attempted to harm [him], operating under the extensive networks of influence that this man has developed" (Exh. 1, at 3 (English translation of Spanish language declaration)).[5]  The declarant's fear stems in part from Duarte's "political contacts and the corruption networks he developed, as well as his extensive financial capacity in large part because of the funds he obtained illegally" (Exh. 1, at 6).  According to the witness, who began cooperating with state authorities in Mexico, a nephew and close associate of Duarte, Gerardo Villegas, "openly threatened me through a Blackberry text message . . . with alleged criminal acts that he would make known about me" (Exh. 1, at 4).  Following that blackmail threat, the witness received a call from Duarte that "summon[ed]" him to a meeting on March 26, 2017, in El Paso, Texas (*id.*).  Duarte and the witness met in a restaurant parking lot in El Paso (*id.*).

From the start of the conversation, Duarte's "gestures and attitude" conveyed "anger[,] and he had an aggressive tone" (*id.*).  Duarte told the declarant that Duarte's sources had seen him meeting with an attorney and that "he knew that [the declarant] wanted to be a protected witness" (*id.*).  Duarte stated that "the concept"—presumably, government protection—"did not exist" (*id.*). Furthermore, Duarte demanded to know whether the witness was "with him or against him," and

---

[5] Because the exhibit aggregates multiple documents with their own page numbers together, these citations refer to the internal pagination of the English translation.

warned, "if it was the latter, that I [the declarant] would experience the consequences" (*id.*).  The declarant stated that, to protect his family, he intended to "be truthful" with the authorities (*id.*).  Duarte then asked the witness to describe the matters in which the witness was involved and dismissed certain allegations against him as baseless; according to Duarte, he "would always deny this and all of the other acts" (*id.*).  Duarte claimed that "they were never going to be able to arrest him and on the contrary, there would come a time when he would first put the current Governor Javier Corral in prison, because he had the full support of the federal authorities, and he likewise . . . would get those federal authorities to go after [the declarant] and put [him] in prison" (Exh. 1, at 5).  The meeting concluded with Duarte warning the witness that he "would be better off with [Duarte]" (*id.*).

After those events, in December 2017, a friend and former government official advised the witness to "be very careful because" Duarte "still had federal support" (Exh. 1, at 6).  On February 6, 2018, the witness met with an official in the Ministry of Internal Affairs, where the official told the witness "to change [his] testimony to disassociate Cesar Duarte and Alejandro Guttierez, and that in exchange they would give [him] a plea bargain" (*id.*).  However, he refused this demand because "what he was asking . . . was not the truth of the matter" (*id.*).  "All of these threats continued until the new federal administration came in, in December of 2018" (Exh. 1, at 7).

Duarte's former private secretary attested to similar intimidation or tampering efforts (Exh. 2).  According to the secretary, shortly before Duarte's administration ended, Duarte spoke to him in the Governor's Mansion and raised "the principle of loyalty," telling the secretary "that people who are disloyal always end up paying for it either themselves or their family" (Exh. 2, at 2).  Duarte conveyed this statement "in a threatening, intimidating tone, with a lot of emphasis," which

made the witness "afraid for [him]self and [his] family" (*id.*).  Notably, the secretary believed that Duarte "had been waiting to tell [him]" this threat "because it didn't have anything to do with what [they] were talking about" at the time (*id.*).  By the time of that conversation, it was widespread public knowledge that there were numerous irregularities in the handling of public funds and that Duarte faced criminal investigation (*id.*).

Much as he did with the other witness, Duarte requested a meeting with his former secretary and another former employee of his wife at a restaurant in El Paso, Texas (Exh. 2, at 3).  Duarte told the two to sit at a separate table so that he could "call[] on [them] to talk with him one by one" (*id.*).  Duarte told the witness that "he had already arranged everything and that those who were investigating him weren't going to be able to prove anything" (*id.*).  As he did with the protected witness, Duarte urged his private secretary to "support him in the investigations" and promised to "protect [them]" if they did so (*id.*).  After that meeting, the witness noticed several vehicles following him throughout the day, and he suspected Duarte of sending that surveillance; in addition, a former associate of Duarte's wife repeatedly tried to contact him beginning in May 2019, likely to connect him with Duarte (Exh. 2, at 4-5).

One shared aspect of these accounts is particularly notable: Duarte met with and attempted to influence these witnesses' testimony in the United States, and not only in Mexico.  Both accounts corroborate each other closely on this point and describe how Duarte arranged for meetings in El Paso.  Moreover, both accounts describe Duarte making similar statements suggesting that loyalty would be rewarded, while testifying against him could result in adverse consequences to the witnesses or their families.  There is no reason why Duarte could not continue to perpetrate this pattern of alarming conduct if he were free on bond.  The witness accounts

establish that Duarte is capable of threatening witnesses from the United States and also retains an influential network in Mexico to assist him in reaching his former employees or subordinate officials who remain in that country.  Even under the more lenient standards of the Bail Reform Act, the intimidation of witnesses is a factor that strongly favors detention of a defendant.  *See, e.g.*, *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990) (reversing release order and determining that the defendant could not overcome the presumption of detention applicable to his serious drug charges because, among other things, the defendant had "threatened to harm a witness's children if he testified").

Either Duarte's risk of flight or the danger to the community and the witnesses with knowledge of his conduct as Governor would be enough, standing alone, for the Court to deny any forthcoming application for bail.  But even if the Court were satisfied that Duarte is not a flight risk, the government is unaware of any "special circumstances" that would justify bail in this case.

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances."  Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Mexico, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## III.    CONCLUSION

For the foregoing reasons, the United States requests that Duarte be detained pending resolution of this extradition proceeding.

Dated: July 24, 2020                        Respectfully submitted,

                                            Ariana Fajardo Orshan
                                            United States Attorney


                              By:      /s Jason Wu
                                       Jason Wu
                                       Assistant United States Attorney
                                       Court ID No. A5502299
                                       99 N.E. 4th Street
                                       Miami, FL 33132
                                       (305) 961-9226
                                       Jason.Wu@usdoj.gov


                                       /s Christopher J. Smith
                                       Christopher J. Smith
                                       Associate Director
                                       Office of International Affairs
                                       Criminal Division
                                       U.S. Department of Justice
                                       Court ID No. A5502264
                                       1301 New York Avenue NW
                                       Washington, D.C. 20530
                                       (202) 532-4254
                                       Christopher.J.Smith@usdoj.gov


                                       /s Rebecca A. Haciski
                                       Rebecca A. Haciski
                                       Trial Attorney
                                       Office of International Affairs
                                       Criminal Division
                                       U.S. Department of Justice
                                       Court ID No. A5502265
                                       1301 New York Avenue NW
                                       Washington, D.C. 20530
                                       (202) 616-2534
                                       Rebecca.Haciski@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was uploaded onto

the Court's CM/ECF system and sent via CM/ECF to all counsel of record.

<u>/s *Jason Wu*</u>
Jason Wu
Assistant United States Attorney

27